[L. A. No. 21085. In Bank. May 2, 1950.]

RIVERSIDE CEMENT COMPANY (a Corporation) et al.,
Petitioners, v. THE PUBLIC UTILITIES COMMIS-
SION, etc., et al., Respondents.

O'Melveny & Myers, Lauren M. Wright, Overton, Lyman,
Plumb, Prince & Vermille and Wayne H. Knight for Peti-
tioners.

Everett C. McKeage, Roderick B. Cassidy, Boris H. Lakusta,
Hal F. Wiggins, J. Thomason Phelps, Harold J. McCarthy,
Henry W. Coil, H. M. Hammack and Donald J. Carman for
Respondents.

SHENK, J.—This is a proceeding to review an order of
the Public Utilities Commission which dismissed three com-
plaints for reparations filed by Riverside Cement Company
and Southwestern Portland Cement Company. Only two of
the cases are involved, and the pertinent facts as to them will
be noted.

In the fall of 1942, at the request of the United States War Production Board, Riverside Cement Company (referred to as Riverside), reopened its plant near Oro Grande. Power was furnished by California Electric Power Company (referred to as the utility) and Riverside commenced negotiations to obtain a rate lower than the filed tariff schedules and on a par with rates afforded under existing special contracts. A contract approved and authorized by the commission was executed by which the utility was to supply electric energy for a five-year term commencing October 14, 1942, at a minimum charge of $1.00 per month per horsepower of maximum demand but not less than $4,000 per month, or a total minimum of $240,000 for the five-year period. Paragraph 10(e), designated as the escalator clause, provided that whenever during the contract the market price of fuel oil should exceed $1.30 per barrel, the energy charge should be automatically increased one-fourth mill per kwh for each full 10-cent increase above the basic oil price. Elsewhere the contract provided for written notice of the increase to Riverside which had the option to rescind within 90 days, the increased rate to become effective if the option was not exercised. Paragraph 14 of the contract stated: "That in the event the [utility] Company shall at any time, either voluntarily or by order of any legal authority place in effect any lower or more advantageous rates than those at any time in effect hereunder or to any other cement manufacturing plant or consumer having a load similar to that of Consumer and in the same territory, the Company shall likewise make the same rate effective for the Consumer hereunder." By agreement the contract was extended to March 31, 1948.

On March 19, 1947, the market price of fuel oil increased to $1.50 per barrel, and pursuant to notice the service charge was raised five mills per kwh effective July 1, 1947. Notice of rescission of the contract was not given. In the same manner an additional identical increase became effective on October 23, 1947, reflecting the rise in the fuel oil market price to $1.70 per barrel. Pursuant to a third notice following the upward fluctuation in the fuel oil price to $2.15 per barrel, a further increase of one cent per kwh might have been charged commencing April 12, 1948, except for the expiration of the contract on March 31, 1948. After the latter date the Riverside service charge was governed by the tariff schedules on file with the commission.

A similar contract was executed between the utility and Southwestern Portland Cement Company (herein referred to as Southwestern), except that the contract period was from May 1, 1944, to April 30, 1949. The same increases were noticed and charged under the escalator clause, but as in the case of Riverside after March 31, 1948, service was billed according to the filed schedules.

Riverside filed a complaint with the commission invoking the application of paragraph 14 of the contract, alleging overcharges after July 1, 1947, and seeking reparations in the sum of $21,739.91. Similarly Southwestern sought reparations to the extent of $16,535.72. The commission found that increases in the fuel oil market price above $1.41 per barrel would and did from July 1, 1947, result in charged rates higher than rates computed under the filed schedules or than rates under contracts of four other consumers alleged to have similar loads and to be operating in the same territory. During the existence of these contracts none of the filed schedules or other existing contract rates was revised in any manner bearing on the issues presented.

The question of which rate was chargeable from July 1, 1947, to March 31, 1948,—the successive increased rates under the escalator clause or the rate under the filed schedules or other contracts of similar consumers in the same territory— depended on the effect to be accorded the language of paragraph 14. The commission rejected the contention of the petitioners that it was the parties' expressed intention that if at any time there was available a schedule or other rate lower than the contract rate the lower rate was to be made available to the petitioners. On the contrary the commission adopted the utility's contention that by the use of the word ''shall'' in paragraph 14 the intention was to make available to the petitioners only such lower or more advantageous rate as should in the future be placed in effect either by the utility or the commission; that is, that since the lower rates from July 1, 1947, were under schedules or contracts which were in effect at the time of the execution of the petitioners' contracts, they were not rates which the utility thereafter placed in effect; that the oil escalator clause rather than paragraph 14 applied; that petitioners' remedy was rescission after notice of the increase; that that remedy was not pursued and the petitioners were not entitled to reparations.

The petitioners urge that the position of the commission is contrary to the applicable policy announced in other cases.

In *City of Vernon* v. *Southern Calif. Gas Co.*, Dec. No. 21860, 34 C.R.C. 46 (Dec. 1929), and *Batchelder-Wilson Co.* v. *Southern Calif. Gas Co.*, Dec. No. 22806, 35 C.R.C. 132 (Aug. 1930), several complainants were held entitled to reparations because of the defendant's failure to comply with a rule, designated as Rule 19, making it the duty of the defendant where two or more rate schedules were applicable to any class of service to call attention to the different rates at the time application was made for the service, and whenever new schedules should be adopted to call the consumer's attention to the new rates.

A similar Rule 19 applicable to the utility was in effect when the consumer selected a rate under tariff schedules in existence at the time service was requested, and placing upon the utility the duty to advise those of its customers affected in the event of adoption of new or optional schedules or rates. This rule and the foregoing decisions of the commission indicate a required utility policy of affording to the consumer the opportunity to select the lowest rate suited to its needs at the commencement of service and the consumer's right to be kept apprised of new lower rates when such should become effective.

Apparently none of the existing schedule rates was deemed suitable to the needs of these petitioners, who sought a lower rate to be based on guaranteed length of service and specified minimum payments. The executed contract providing such a rate was based on those considerations. Since Rule 19 was inapplicable to the special case, paragraph 14 was added to the contract for the obvious purpose of complying with the required policy, thus preserving to the petitioners the right to a lower or more advantageous rate should such be placed in effect during the life of the contract.

As the provisions both of Rule 19 and paragraph 14 indicate, it was not the purpose to place on the consumer the onus of seeking and acquiring information as to the probable lowest available tariff. The utility thereby undertook to perform the office of supplying the information and opportunity of selection when occasion demanded. The general policy required the utility to afford to the consumer the lowest or most advantageous rate. Since the purpose of the contracts was to obtain a rate lower than the filed tariffs and on a par with other special rates, it is unreasonable to assume that the petitioners agreed to pay any rate higher than such existing rates. The contrary intention expressed in paragraph 14 indi-

cates that if, at any time during the contract, rates lower than the contract rates should become available the petitioners should have the advantage thereof. It follows that the purpose of the escalator clause was to protect the utility's cost differential between the lower contract rate and available existing tariffs. And it is likewise unreasonable to assume that the utility might with impunity employ that clause to raise charges above existing schedules. The utility itself recognized the appropriate remedy and procedure when the price of fuel oil no longer justified the filed tariff schedules and in 1948 applied to the commission for increases in those tariffs. It was during the progress of that application that the petitioners discovered they had been paying charges higher than the existing tariffs.

The utility's attempt to rest upon the future tense of the verb in paragraph 14 cannot avail it under the facts. Obviously the language would apply in the event tariffs were reduced below the contract rate. But that is not the exclusive application. A similar situation in effect obtained here when the company gave notice increasing the contract charge above the existing tariff. That act was the equivalent of placing in effect a rate or schedule lower or more advantageous than the contract rate. As the commission found, the price of fuel oil could go to $1.41 without increasing the contract rate above the filed tariff. When, however, the utility raised the contract rate above the filed tariff, to all the intents and purposes of paragraph 14 it was placing in effect a rate lower or more advantageous than the increased contract rate.

It may not be questioned that if the language of paragraph 14 applied it took precedence over the provisions of the escalator clause and afforded a lower rate to the petitioners from July 1, 1947, overcharges resulted, and the petitioners were entitled to recover reparations. That result is determinative here and it becomes unnecessary to discuss other matters, none of which may be deemed to override the controlling intent and policy. Nor is it proper on this review to consider which of the lower rates applies, whether that under the filed tariffs or the contract rate of other consumers in the same territory. Those are factual issues bearing on the amount of the reparations and are for the commission to resolve.

From the foregoing it follows that the portions of the commission's order dismissing the two complaints should be annulled and the cases remanded for computation of the

amount of reparations due to the petitioners respectively.

It is so ordered.

Gibson, C. J., Carter, J., Schauer, J., and Spence, J., concurred.

TRAYNOR, J., Dissenting.—The annulment of the commission's order is based on the premise that the utility placed in effect lower rates to another consumer having a load similar to that of petitioners within the meaning of paragraph 14 of the contract. The rates allegedly placed in effect are the tariff rates that were in effect when the contract was signed. In 1942, when Riverside asked the commission's approval of a special contract deviating from PW-1 and PW-2, the existing tariffs, Riverside stated in a letter to the commission on October 7, 1942: ''With reference to the Power Company's published schedules PW-1 and PW-2, our belief is that neither of these schedules is reasonably adapted to the conditions of cement plant operation. So far as we are advised, no cement company has ever operated under either of these schedules.'' Yet we are now asked to interpret the contract as having incorporated a schedule not ''reasonably adapted to the conditions of cement plant operation.''

It is contended that the original tariff of rates in effect in 1942 when the special contract was signed by the parties and approved by the commission was ''placed in effect'' on July 1, 1947, when the utility raised the contract price of electricity (above the level of the tariff prices) by virtue of the fuel oil escalator clause, paragraph 10(e). The words ''shall place in effect'' would ordinarily lead one to interpret paragraph 14 as applying only to tariffs approved after the signing of the contract. It is urged that paragraph 14 be construed to limit possible increases under the ''escalator'' clause to the level of rates already in existence because ''the purpose of the escalator clause was to protect the utility's cost differential between the lower contract rate and available existing tariffs.'' Testimony in the record bearing on the meaning of the fuel oil escalator clause runs counter to this interpretation, and leads to the conclusion that the purpose of the clause was to preserve for the utility a margin of profit over its operating costs.[1]

---

[1] ''One of the two witnesses heard by the Examiner was the chief rate engineer of the defendant utility, called as a witness by the complainant. He testified:

''Q. Didn't you, in general, try to establish your rates so that com-

If this testimony is disregarded and the existing rates are accepted as a ceiling on the rates under the contract,[2] paragraph 12 thereof is rendered meaningless. That paragraph specifically gives the consumer power to terminate the contract after an increase in price under paragraph 10(e), the "escalator" provision. The protection afforded the consumer by this power of termination and the protection afforded the utility by the escalator clause are both rendered superfluous if the contract rates no longer apply after the price of fuel oil rises to $1.41 per barrel, the point at which the price of fuel oil causes the price of power under the contract to rise to the level of the tariff prices. In my opinion the contract per-

panies like the Cement Companies, with large volumes of power or using large volumes would pay less per kilowatt hour than the companies using a smaller volume of power?

"A. Yes, as long as we had large volumes of cheap power available.

"Q. And you tried, in general, to keep the relationship between the Cement Companies and other large volume users versus the smaller users on that basis as best you could?

"A. Except that where a margin of profit was extremely small we have incorporated hedging clauses like the fuel oil clause so that we would not be caught selling power at a loss when prices went up.

"Q. Coming back to my question again, the policy was, apart from the earnings of the Company, the policy was, as between rates for consumers, that the larger volume consumer would normally have a lower rate than the smaller volume consumer?

"A. Generally, yes; when you got into very large volumes other factors entered.

"Q. Do you have any instance in your Company, or did you have in 1947, where you considered large volume users should pay a higher rate for their electricity than lower volume users?

"A. Yes, we did. You have to consider, if you are thinking of the Southwestern and Riverside Cement, you have to consider the period of the contract as a whole, and if we were selling on a very thin margin of profit there, which was evidently contemplated in the contract, this eventuality was contemplated in the contract so that when our costs went up this thin margin was preserved to a degree."

[2] Had the parties so intended the provision could have been drafted simply and directly. In a recent case before the commission (*Re Pacific Gas & Electric Co.*, Decision No. 42234, Application No. 27459), a utility was permitted to modify a special contract containing an escalator clause. The modification conformed to an oral understanding between the utility and the consumer-lumber company that: "In the event, during the term of said agreement, application of rates and conditions of an applicable filed electric tariff of Pacific to the account of lumber company would result in lower cost for electric service than the rates set out in said agreement, lumber company would be accorded the benefit thereof." Both parties in that case agreed that this sentence embodied the understanding of the parties. In the present case there was no testimony by Cement Company officials concerning the original negotiations; petitioners have sought merely to make paragraph 14 applicable.

For another example of a contract containing a fuel oil escalator clause subject to stated maximum and minimum rates, see *City of Vernon v. Southern Calif. Gas Co.*, 34 C.R.C. 46 [1929].

mits the consumer either to continue the contract in the hope of a drop in fuel oil prices or to terminate the contract and accept the potential advantages or disadvantages of the tariff rates. To order reparations to the petitioners now that the contract has expired permits the consumer to accept all the benefits of the contract, with prices set retroactively as though their power to terminate had been exercised.

We turn now to the four special contracts with other consumers that allegedly "placed in effect" lower rates. Two of the contracts, those with Sierra Talc Company and Natural Soda Products Company, merely extended the rates of Schedule P-2, a schedule of limited applicability, to companies that had been served on that basis for years. After the commission authorized the utility to cancel the schedule of limited applicability, the same rates were continued by special contracts. The contract with West End Chemical Company provided the same rates as those set forth in the filed schedule No. PW, discussed above. It cannot be said that lower rates were "placed in effect" by these three contracts, since they merely continued rate schedules available to and refused by petitioners at the time their contract was signed. The conclusion that paragraph 14 did not refer to the PW schedules in effect when the contract was signed applies with equal force to contracts that provided rates equivalent to the tariff rates.

Finally, petitioners complain that the contract between the utility and the United States Navy for service to the Naval Ordnance Station at Inyokern "placed in effect" lower rates. The commission apparently agrees: "that contract contained rates which were identical with those in Option B of rate Schedule No. PW. Since the Navy received service at 33,000 volts, a discount of 5% was incorporated in the contract. The inclusion of this high voltage discount, coupled with the provisions of Schedule No. PW, in the commission's opinion constituted placing in effect a lower and more advantageous rate than Schedule No. PW." The commission concluded, however, that even "if the Cement Companies had facilities available to take delivery at this voltage, and could have qualified for the high voltage discount, it is not apparent that the rates of the special contract with the Navy Department would have produced a lower bill throughout the period of the contracts than was actually billed to the Cement Companies." The failure to grant reparations despite the finding that the rate to the Navy was lower than the contract rate to Riverside

and Southwestern indicates that the Cement Companies failed to sustain their burden under section 71 of proving to the commission that they were injured because the utility "deprived them of any rate to which they were entitled." (*Batchelder-Wilson Co.* v. *Southern Calif. Gas Co.*, 35 C.R.C. 132, 134; *City of Vernon* v. *Southern Calif. Gas Co.*, 34 C.R.C. 46, 48.)

We are referred to Rule and Regulation No. 19, the "policy" of which was allegedly violated by the utility in this case. The applicable portions of the rule provide: "(b) Where there are two or more rate schedules applicable to any class of service, the Company or its authorized employees will call applicant's attention, at the time application is made, to the several schedules, and the customer must designate which rate or schedule he desires. (c) In the event of the adoption by the Company of new or optional schedules or rates, the Company will take such measures as may be practicable to advise those of its customers who may be affected that such new or optional rates are effective." It is conceded that Rule 19 applies only to consumers given service under tariff schedules and not to consumers with special contracts. This fact alone distinguishes the cases relied upon by petitioners, since all the consumers granted reparations in those cases were operating under rate tariffs. (*Batchelder-Wilson Co.* v. *Southern Calif. Gas Co.*, 35 C.R.C. 132; *City of Vernon* v. *Southern Calif. Gas Co.*, 34 C.R.C. 46.) Furthermore, Rule 19 applies by its terms only where two or more rate schedules are available at the time application for service is made, or "in the event of the adoption by the [utility] of new or optional schedules or rates." In the latter case, the utility is bound only to take such measures to advise consumers "as may be practicable."

Even if it is assumed that paragraph 14 gives the consumer the protection of Rule 19, it does not follow that the utility undertook "to perform the office of supplying the information and opportunity of selection [of more advantageous rates] when occasion demanded." Under the commission's view, this would be a promise to perform the impossible. "Since any such determination depends upon the future operations of this customer, the final decision with respect to whether or not any other rates are lower or more advantageous is the ultimate responsibility of the customer. Neither the utility nor this Commission can anticipate future customer usage which is

entirely within the discretion of the customer as to its future volume."[3]

Rule 19 requires notification, as may be practicable, about newly promulgated tariff schedules or novel special contracts. Neither the letter nor the spirit of Rule 19 requires utilities to prognosticate the future nature and extent of the consumer's use of power and then advise the consumer if there is a possible advantage under preexisting tariff rates. It is sensible to require notice to consumers of newly-adopted schedules or contracts, because the consumer probably would not have knowledge of them. It is a different matter when the utility is placed under a duty to give notice of tariffs that had been in effect at least five years and from which the consumer had specifically asked to be excepted.

Since the rise in power prices under the "escalator" clause did not "place in effect" lower rates within the meaning of paragraph 14, and since Rule 19 does not apply to this case, the order should be affirmed.

Edmonds, J., concurred.

Respondents' petition for a rehearing was denied June 1, 1950. Edmonds, J., and Traynor, J., voted for a rehearing.

---

[3]The rate schedule of the contract indicates that the monthly charge for electricity fluctuates with the intensity and volume of customer usage. Paragraph 10 provides:

"ENERGY CHARGE—First 200 kilowatt-hours per month per horsepower of maximum demand ........... 1.04 cents per kwh
All over 200 kilowatt-hours per month per horsepower of maximum demand .. ....................... .416 ″ ″ ″

"MINIMUM CHARGE—$1.00 per month per horsepower of Maximum Demand, but not less than $4,000.00 per month.

"SPECIAL CONDITIONS—(a) The maximum demand in any month shall be the average horsepower input, (746 watts equivalent), indicated or recorded by instruments to be furnished and installed by the Company upon Consumer's premises adjacent to or integral with watt-hour meter or meters, in the 15-minute interval in which the consumption of energy is greater than in any other 15-minute interval in such month, or, at the option of the Company the maximum demand may be determined by test.

"(b) The maximum demand for monthly billing purposes for any given month shall be the horsepower of measured maximum demand occurring during such month but in no case less than 75% of the maximum demand occurring during the eleven next preceding months.

"(c) In case notice of contemplated curtailment of operations on the part of Consumer is given to the Company and such curtailed operations occur over a period of at least six consecutive calendar months, the provisions of paragraph (b) hereinbefore shall not apply. . . ."