[S.F. No. 23215. In Bank. Dec. 12, 1975.]

CITY OF LOS ANGELES et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
PACIFIC TELEPHONE AND TELEGRAPH
COMPANY, Real Party in Interest.

[S.F. No. 23237, 23257. In Bank. Dec. 12, 1975.]

CITY OF LOS ANGELES et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
GENERAL TELEPHONE COMPANY OF
CALIFORNIA, Real Party in Interest.

**COUNSEL**

Burt Pines, City Attorney (Los Angeles), Leonard L. Snaider, Deputy City Attorney, Leonard Putnam, City Attorney (Long Beach), Robert E. Shannon, Deputy City Attorney, John Witt, City Attorney (San Diego), Robert J. Logan and William S. Shaffran, Deputy City Attorneys, Thomas O'Connor, City Attorney (City and County of San Francisco), and Milton H. Mares, Deputy City Attorney, for Petitioners.

Richard D. Gravelle, J. Calvin Simpson and Andrew J. Skaff for Respondents.

Albert M. Hart, H. Ralph Snyder, Jr., O'Melveny & Myers, Allyn O. Kreps, Edward D. Burmeister, Jr., Steven C. Babb, James A. DeBois, William R. Roche, Pillsbury, Madison & Sutro, Noble K. Gregory, Richard W. Odgers, James B. Young and Francis Kirkham for Real Parties in Interest.

## OPINION

**TOBRINER, J.**—In these three telephone rate cases the Public Utilities Commission determined, inter alia, that it lacked legal authority to approve tariffs which would annually adjust telephone rates to take account of changing federal tax expenses. As a consequence, the commission found itself compelled to set a rate which, in its own words, would "create a windfall for [the telephone companies] to the detriment of the ratepayers." (*Re Pacific Telephone & Telegraph Co.* (1974) — Cal. P.U.C. — (Decision No. 83162; slip opn., p. 63).) The commission took this action in spite of our having annulled its previous decisions in this matter "[f]or failure to consider lawful alternatives in calculation of federal income tax expense." (*City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119, 130 [98 Cal.Rptr. 286, 490 P.2d 798].) As we explain, we have concluded that the commission does possess the power to implement an annual adjustment scheme, and we accordingly remand these cases in order that the agency may reconsider its action with knowledge of the full scope of its powers.

In addition to this failure to consider lawful alternatives in the treatment of tax expenses, the petitioning cities assert as grounds for annulment: (1) that the commission authorized an unreasonably high rate of return for the two telephone companies in question; and (2) that the commission erred in promulgating an interim rate pending its rehearing of the General Telephone case. As to the first contention, we have concluded that the commission did not exceed the boundaries of its discretion. (Pub. Util. Code, § 1757.) As to the second contention, we show below that the commission regularly pursued its authority.

*1. The background of the present litigation.*

Because these cases spring from the relationship between federal taxing authority and public regulatory power, we must review pertinent developments in these two fields.

An extremely significant element of the operating expenses which a rate-setting agency must consider is that of state and federal taxes;[1] increased tax deductions decrease a utility's tax bill and with it the revenue it must acquire from its ratepayers. These cases turn on two such tax deductions available to General and Pacific,[2] accelerated depreciation and the Job Development Investment Credit;[3] both of them enable a public utility to reduce its tax expenses, and the efforts of regulatory bodies to pass the benefits of such reduced tax expenses on to the utilities' ratepayers form the backdrop to the instant cases.[4]

Such regulatory efforts are of course mandatory for a state agency charged with insuring that "[a]ll charges demanded or received by any public utility . . . shall be just and reasonable" (Pub. Util. Code, § 451) and that "[n]o public utility shall raise any rate . . . except upon a showing before the commission and a finding by the commission that such increase is justified" (Pub. Util. Code, § 454). We therefore examine the background of these cases to determine whether the commission has failed to consider alternative means of dealing with unnecessary tax payments which might be eliminated to the benefit of the ratepayers.

Since 1954, section 167 of the Internal Revenue Code has given business taxpayers several options in computing depreciation deductions from their federal taxes. Thus the utilities in the instant case may, like other businesses, assume that their depreciable assets wear out at an even rate and deduct the same amount of depreciation for each year of useful life; such an assumption is known as "straight-line" depreciation. Another option, first made available by 1954 amendments to the Internal Revenue Code is "accelerated" depreciation (Int. Rev. Code of 1954, § 167(b)(2)-(4)); using this method the enterprise takes deductions as if the

---

[1]According to one authority, as of 1967 United States telephone companies spent 23 percent of their total revenue on taxes. (Welch, Cases, Text, and Material on Public Utility Regulation (rev. ed. 1968) p. 440.)

[2]We refer in this opinion to the real parties in interest in the instant case, General Telephone Company of California and Pacific Telephone and Telegraph Company, as General and Pacific, respectively.

[3]The Job Development Investment Credit (85 Stat. 503, 26 U.S.C. § 46 et seq.), a tax deduction which all parties concede has tax and revenue effects substantially similar to accelerated depreciation and therefore calls for identical treatment, will be included in all subsequent references to accelerated depreciation.

[4]In the instant Pacific proceeding the commission indicated that for *1973 alone* "the difference in gross revenue requirements between" a rate passing tax benefits on to the consumer and one permitting the utilities to retain these benefits "is approximately $23 million." (*Re Pacific Telephone & Telegraph* (1974) — Cal. P.U.C. —, — (Decision No. 83162, slip opn., p. 71).)

asset in question depreciates more rapidly in the earlier years of its life and more slowly thereafter.[5] A taxpaying utility using accelerated depreciation would deduct the same *total* amount of depreciation over the useful life of the asset as a taxpayer using straight-line methods, but accelerated depreciation permits the largest part of this total to be deducted in the early years of the asset's life.

If one thinks of a single piece of depreciable equipment, such as a desk or typewriter, over the long run it would make no difference which system of depreciation were employed since the utility could write off no more than the total value of the asset in any case. That which holds true for a single asset, however, does not do so for an enterprise considered as an evolving whole. (Bonbright, Principles of Public Utility Rates (1961) pp. 218-223;' see *Alabama-Tennessee Natural Gas Co.* v. *Federal Power Com'n.* (5th Cir. 1966) 359 F.2d 318, 328.)

Ratemakers have discovered that if the total enterprise is either expanding or stable, the use of *accelerated depreciation does not merely defer taxes, but eliminates them entirely.* (See *FPC* v. *Memphis Light, Gas & Water Div.* (1972) 411 U.S. 458, 460 [36 L.Ed.2d 426, 430, 93 S.Ct. 1723]; Note, *The Effect on Public-Utility Rate Making of Liberalized Tax Depreciation Under Section 167* (1956) 69 Harv.L.Rev. 1096, 1102.) This effect occurs because in the later years of an asset's life (when its value as a depreciation deduction has been used up), its place is taken by a *new piece of equipment, which replaces it as a deduction in income tax calculation.* This replacement effect means that the higher depreciation taken in early years does not have to be paid for by lower depreciation in later years; *the tax never catches up.* The result is a net tax savings to any utility using accelerated depreciation.[6]

---

[5] In fact, the code and Treasury Regulations permit several different forms of accelerated depreciation, the differences between which are not here relevant; *all* forms of accelerated depreciation result in a deduction larger than that permitted by straight-line methods in the earlier years of the asset's life.

[6] A respected federal appellate judge has explained the apparently paradoxical tax savings as follows: "Lifetime depreciation on a single item of property is of course the same whether the utility elects straightline or accelerated depreciation. Under conventional accounting principles, therefore, the full amount of the value of the item less salvage would be a deductible expense. Conventional accounting, however, does not take into consideration the effect of applying liberalized depreciation to a utility's total assets which are, of course, subject to a continuing cycle of obsolescence and renewal. If the industry is stable or expanding, requiring the utility's *continued reinvestment in plant equal to or in excess of plant retirement,* a program of liberalized depreciation produces true tax savings because there is no reduction in the tax reserve fund [fn. omitted]."

For a rate-setting agency the comprehension of this counter-intuitive fact has important implications. If the Public Utilities Commission in setting rates were to assume that tax deductions for depreciation under both the straight-line and accelerated methods would yield the same result in the long run, it would, in fact, award the utility a rate windfall. For it would have set rates as if the utility would incur tax expenses *which it would never have to pay.*

In 1960 the California Public Utilities Commission after studying this problem issued a report indicating that it would pass on to ratepayers any savings effected by the adoption of accelerated depreciation and suggesting that the utilities' managements elect this method. (*Commission Investigation Regarding Rate Fixing Treatment for Accelerated Amortization and Depreciation for all Utilities,* 57 Cal. P.U.C. 598.)[7]

Pursuant to this recommendation "[a]pparently *all utilities other than Pacific and General Telephone* have used accelerated depreciation." (*City and County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119, 124; italics added.) Because "Pacific and General Telephone, unlike other utilities . . . refused to use accelerated depreciation . . . [o]n November 6, 1968, in Decision No. 74917 the Commission determined that Pacific's management was imprudent" in not electing the option and "concluded that . . . for purposes of rate making Pacific would be treated as if it had obtained the tax saving of accelerated depreciation and that the saving would be [passed on] . . . to the consumers in the form of lower rates. (Imputed accelerated depreciation with flow-through.)" (*Id.*)[8]

---

(*Alabama-Tennessee Natural Gas Co.* v. *Federal Power Com'n., supra,* 359 F.2d 318, 328 (Wisdom, J.); italics in original.)

The United States Supreme Court has explained that the effect described by Judge Wisdom occurs because "the depreciation allowances from additional and replacement equipment offset the declining depreciation allowance on existing property." (*FPC* v. *Memphis Light, Gas & Water Div., supra,* 411 U.S. 458, 460 [36 L.Ed.2d 426, 430]; see also Note, *The Effect on Public-Utility Rate Making of Liberalized Tax Depreciation Under Section 167* (1956) 69 Harv.L.Rev. 1096, 1102.)

[7]Economists recognize that accelerated depreciation, when combined with flow-through accounting, encourages timely replacement of needed capital equipment (Defliese, *Changing Accounting Objectives—What About Utilities?* (1972 No. 2) 90 Pub. Util. Fort. 17, 20-21) in the extremely capital-intensive public utility industry (Rudolph, *Depreciation and Changing Price Levels: Specific Problems of Utilities,* in Depreciation and Taxes (Tax Inst. ed. 1959) pp. 80, 80-81) and permits obsolescence to be recognized before rather than after the fact "so that consumers will reap the benefits of progress that much sooner." (Defliese, *supra,* at p. 21.)

[8]The commission's ruling corresponded with the conclusion reached by Swiren, *Accelerated Depreciation Tax Benefits in Utility Rate Making* (1961) 28 U.Chi.L.Rev.

In 1969, however, Congress amended the Internal Revenue Code.[9] The amendments, some of a highly technical nature, provided that utilities which had not taken accelerated depreciation before 1969 could do so subsequently only if they "compute[d] their cost of service, which includes federal income taxes, as if they were using straight-line depreciation. This method, referred to as 'normalization,' [10] was designed to avoid giving the present customers of a utility the benefits of tax deferral attributable to accelerated depreciation. If a utility used accelerated depreciation in determining its actual tax liability, the difference between the taxes actually paid and the higher taxes reflected as a cost of service for ratemaking purposes was required to be placed in a deferred tax reserve account. See *Amere Gas Utilities Co.,* 15 FPC 760." (*FPC* v. *Memphis Light, Gas, & Water Div., supra,* 411 U.S. 458, 460 [36 L.Ed.2d 426, 430].) After the passage of these laws Pacific and General reversed their longstanding opposition to accelerated depreciation and began to take the larger deductions it authorized; they contended, however, that if the commission passed on to the ratepayers any of the savings thereby achieved, "degradation of service and possible financial collapse" would result and the utilities would "go bankrupt."[11]

In the wake of these developments a divided Public Utilities Commission decided that it "could not continue the existing method of *imputing* accelerated depreciation" to the utilities (*City and County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119, 125; italics added) and therefore that " 'it would now be futile to consider' " other methods benefitting the ratepayer because normalization was the only available alternative. (*Id.,* at p. 126.) We annulled.

---

629, 632: "The public interest requires that utilities maintain their costs at the lowest level consistent with proper service to the consumer. Accordingly, if the flow-through theory is sound and the reduction in current taxes is a permanent saving, *utilities should be required to utilize that procedure.*" (Italics added.)

[9]Internal Revenue Code of 1954, section 167(*l*), as amended December 30, 1969; see *City and County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119, 125.

[10]Internal Revenue Code of 1954, section 167(*l*)(3)(G), as amended December 30, 1969. As we explained in *City and County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119, 128: "Although the majority opinion [of the commission] ignores this matter, the concurring opinion and the two dissenting opinions [of the commission] recognize that accelerated depreciation and normalization will result in the ratepayers contributing capital to Pacific. As the concurring opinion points out, this method of accounting will 'provide a source of interest-free capital.' We do not know how much capital will be provided, but the dissenting commissioners estimate that the ratepayers in the next 10 years will have to provide between $750,000,000 and one billion dollars."

[11]The commission rejected these contentions abstaining from passing the tax benefits of accelerated depreciation on to the ratepayers only because of its doubts about its legal power to do so.

In a unanimous opinion we held that the commission had not regularly pursued its authority in failing "to consider lawful alternatives in calculation of federal income tax expense." (*Id.,* at p. 130.) Specifically, we ruled that the commission should consider alternatives, which, while taking into account "the imprudent management"[12] of the real party in interest, might serve as "a compromise striking a proper balance between the interests of the ratepayers and . . . [real party in interest] in the light of current federal income tax statutes." (*Ibid.*) The instant case arises from the commission's action on remand.[13]

Following our annullment of its decisions in *City and County of San Francisco* and *City of Los Angeles,* the commission held new hearings. In the case of Pacific we had annulled a final rate,[14] and the commission therefore held entirely new ratemaking proceedings, considering each aspect of revenue and expenses anew. General's case involved an additional factor; as we set forth in the margin, the commission considered appropriate ratemaking treatment of tax expenses for General in two separate proceedings, once in a limited rehearing of a rate case contemporaneous with the annulled Pacific decision,[15] and once in

[12]In the case from which we quote, the phrase referred exclusively to Pacific, but, as we have subsequently pointed out, it might apply equally to General: "Apparently all utilities in California except Pacific and General Telephone follow accelerated depreciation with flow through . . . . Pacific and General Telephone have apparently in the past used straight line depreciation." (*City·of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 338-339, fn. 2 [102 Cal.Rptr. 313, 497 P.2d 785]; cf. *Re General Telephone Co. of Cal.* (1974) — Cal.P.U.C. — (Decision No. 83778, pp. 23, 39).)

[13]Because we held that the commission's failure to consider lawful alternatives in tax treatment was error, and because we subsequently found that this and other errors could not be severed from the remainder of the rate, we annulled the entire Pacific rate. (*City of Los·Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331 [102 Cal.Rptr. 313, 497 P.2d 785].) As noted below (fn. 15, *infra*) the commission, perceiving that the Pacific and General cases involved identical legal issues, reheard the General case. Thus, although strictly speaking, "remand" was involved only in the Pacific case, the commission reconsidered both cases, and we now have before us the results of that reconsideration.

[14]See *City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331, 354-359.

[15]At the time we filed *City and County of San Francisco* v. *Public Utilities Commission, supra,* 6 Cal.3d 119, the commission had just granted General a rate increase based in part upon the same treatment of accelerated depreciation which we found unlawful in *City of Los Angeles* and *City of San Francisco.* (*Re General Telephone Co. of Cal.* (1971) 72 Cal.P.U.C. 652.) Recognizing that the same legal issue controlled both the Pacific and General rates, the commission in response to petitions by the Cities of Los Angeles and Long Beach granted rehearing. (*Re General Telephone Co. of Cal.* (1971) 72 Cal.P.U.C. 725; *Re General Telephone Co. of Cal.* (1972) 72 Cal.P.U.C. 795.) These orders continued in effect the rates promulgated before *City of Los Angeles* was filed, but made them subject to refund if the commission subsequently found them unjustified. (We consider *infra* at pp. 705-707, the propriety of the interim order and the rates established by it.)

hearings held pursuant to a new rate increase request by General.[16] Because all three of these proceedings reached substantially identical treatments of the tax expenses in question by a substantially identical procedural route, we shall describe them as a single proceeding, noting divergences only when necessary.[17]

The commission focused most of its attention on a staff proposal somewhat awkwardly styled "pro forma normalization." Stated briefly, this proposal involves an accounting adjustment which takes account of the fact that the deferred tax reserve (an asset) is much lower at the start of the ratemaking period than it will be after the effects of accelerated depreciation accumulate.[18] The staff plan called for a reduction in the rate base (on which return is calculated) to reflect what is, in effect, an additional source of revenue for the utilities.[19] The commission, however, rejected pro forma normalization on the grounds that it would violate the provisions of the Internal Revenue Code and of a Treasury Regulation interpreting it.[20]

With its attention thus concentrated on the primary staff proposal and Pacific's and General's vigorous objections to it, the commission gave

[16]*Re General Telephone Company of Cal.* (1975) — Cal.P.U.C. — (Decision No. 83779).

[17]The commission's most elaborate and most complete response to the problem and to our order on annulment occurs in its decision in the Pacific case (Decision No. 83162). While considerable discussion is devoted to the topic in the limited rehearing of the General case (Decision No. 83778), the commission staff had at the time of hearing of that matter not yet fully developed its alternative proposals. The two General cases (Decisions Nos. 83778 and 83779) were filed after the Pacific proceeding and rely heavily on it; the Pacific decision (No. 83162) thus becomes the key commission response.

[18]As we have noted, the crucial fact about this deferred tax reserve is that it is a misnomer; unlike other deferred reserves, this one represents not a putting-aside for expenses which will later be encountered, but a *permanent savings*. (See fn. 6, *ante*, and text thereto.) Moreover, the utility can earn interest on this reserve and, unless some adjustment is made, will earn a return from ratepayers on it.

[19]In order to effect this adjustment without running afoul of the new Internal Revenue Code restrictions, the staff proposed to hold the rate of return "even," but to decrease the *rate base*. Pro forma normalization accomplishes this result by substituting for the deferred tax reserve of the *historical* test year which the commission uses to set rates, a figure based on projections of *future* accumulations of this reserve.

[20]While the commission's proceedings in the instant cases were pending the Treasury promulgated a series of regulations which in the commission's view, precluded pro forma normalization. (Treas. Reg. § 1-167(*l*)-1(*h*)(6) (1974).) We here reiterate that in view of our disposition of these cases, we express no opinion regarding the validity of the regulation as an interpretation of section 167 of the Internal Revenue Code of 1954 (cf. *Arkansas-Oklahoma Gas Co.* v. *Commissioner of Int. Rev.* (8th Cir. 1953) 201 F.2d 98, 102; Mertens, The Law of Federal Income Taxation (rev. ed. 1974) §. 3.21, p. 46), the constitutionality of the regulation as an infringement of the powers reserved to the states under the federal Constitution (*U.S. Const.*, Amend. X), or the continued availability of pro forma normalization (cf. fn. 42, *infra*).

only cursory consideration to another proposal, known as "annual adjustment."[21] The record indicates that the hearing examiner suggested to the parties that the feasibility of a system of yearly automatic rate adjustment be investigated. The staff witness accordingly prepared exhibits and testified at some length concerning this rate setting system.[22]

While technical in its application, the concept of an annual adjustment is essentially simple: the rate established by the commission includes a formula which, when applied each year to figures in the utilities' accounts, produces appropriate adjustments in rates to keep them in step with the company's changing financial situation.[23] In the case of annual adjustment to reflect the growing deferred tax reserves, the *actual* amount of the reserve accumulated by the utility would be compared with the amount used in the test year on the basis of which the commission set rates.[24] As the reserve grew, the formula would effect a corresponding reduction in the rate base to take account of this new source of investment capital.

The effect of annual adjustment in some respects resembles that which would occur if the commission each year conducted a new rate proceeding in which all factors except that of tax reserve held constant.

---

[21]The commission devoted a scant ten lines to its discussion of annual adjustment in its original decision in the Pacific case (Decision No. 83162) and supplemented this consideration with but three additional sentences on denial of rehearing (Decision No. 83540). Mention of this opinion on denial of rehearing makes it appropriate to indicate at this point that the commission neither violated the statutes governing its procedures nor trespassed on its discretion in supplementing its opinion upon denial of rehearing. (Pub. Util. Code, §§ 1708, 1736.) Petitioners' contentions to the contrary are meritless.

[22]At the request of Hearing Examiner Barnett the staff witnesses developed the requested information. Their testimony and cross-examination by various parties covers more than 50 pages of reporter's transcript. In addition they submitted some 20 supplemental pages of explanation in the form of exhibits.

[23]For more than three years, subsidiaries of the Bell System providing telephone service in Illinois, New Jersey, and Canada have *sought* "automatic" adjustment clauses to enhance utility productivity and compensate for price and cost fluctuations (Kendrick, *Efficiency Incentives and Cost Factors in Public Utility Automatic Revenue Adjustment Clauses* (1975) 6 Bell J. Econ. 299, 304-309 [hereafter cited as Kendrick]).

[24]In fact, the staff witness suggested two forms of annual adjustment. In one, known as January 1st adjustment, the commission would employ the estimates of tax reserves on the company's books at year end to make its adjustment; in the other form, the commission would wait until the following October, at which point the final figures would be in, before making the adjustment. The disadvantage of the October method flows from the nine-month lag in rate relief, a lag whose effect is cumulative; the advantage of the October clause is that it is based on final figures ascertainable after the company's books have been audited. We perceive no statutory or constitutional significance to flow from the difference between these two methods, and what we say below applies equally to both of them.

In such a case the commission would look to the tax reserve as the sole relevant variable and reduce the rate base to compensate for tax reserve accumulations. As long as the commission's policy towards the tax reserve accumulations remained unchanged, however, such yearly proceedings would reduce themselves to substantially ministerial steps.[25] In similar circumstances the commission has concluded that the promulgation and periodic application of an adjustment formula more efficiently implements its policy.

The commission thus employs adjustment clauses when it encounters an item of expense or revenue which tends to vary abnormally in comparison to the utility's other financial data; fuel cost adjustment clauses, which the commission presently inserts in the tariffs of power companies, constitute a prominent current use of such clauses. The commission's staff experts testified that the rapidly accumulating tax reserves presented an anomalous factor in the telephone companies' financial profile similar to that posed by the fuel costs of the power companies.[26]

The commission accepted this analysis, explaining that: "One consequence of the use of accelerated depreciation by Pacific is to create a rapidly growing reserve for deferred taxes that is totally out of consonance with the roughly harmonious relationship between revenues, expenses, and rate base." (*Re Pacific Telephone* (1974) — Cal.P.U.C.— Decision No. 83162, slip opn. 63); accord, *Re General Telephone Company of California* (1974) — Cal.P.U.C. — (Decision No. 83778, slip opn., p. 24).)

In spite of the applicability of the usual justifications for annual adjustment clauses to the instant cases, however, the commission without

---

[25]As in the case of "automatic" adjustment clauses for productivity and price fluctuations (Kendrick, *supra*, at pp. 306-309), the regulatory commission's primary function should be to gather empirical data periodically on changes in each utility's tax reserve accumulations and then apply relevant data to the adjustment formula.

[26]In the words of the staff witness who explained the mechanics of annual adjustment: "As I have testified and demonstrated both in an earlier phase of this proceeding and in the reopened proceeding of General Telephone Company . . . , the growth of the deferred tax reserve *far exceeds the normal growths of revenue, expenses, and rate bases, which tend to grow proportionately.* . . . The rates of most California utilities are set on the basis that revenues, expenses, and rate base will grow somewhat in *proportion* and these same utilities have no tax reserve as they are on flow through. For a normalization company like Pacific, the rate base *cannot grow as fast as it normally would* because the deferred tax reserve is displacing investment which would come from stock or bondholders for a straight line or flow through company." (Italics added.)

consideration rejected its staff's recommendation that such clauses be made a part of the tariff in the event flow-through and pro forma normalization were rejected.[27] The commission explained its refusal to consider annual adjustment clauses in the following terms: "Nor will we consider further the automatic adjustment clause. This method was proposed with the understanding that the commission would consider it only if Pacific consented to its imposition; Pacific has not consented." (*Re Pacific Telephone and Telegraph Company* (1974) — Cal.P.U.C. — (Decision No. 81362, slip opn. p. 59).)

Elaborating on this somewhat cryptic statement[28] in its opinion on denial of rehearing, the commission indicated that its refusal to consider annual adjustment stemmed from its belief that "Any order which would have the effect of automatically reducing the rates of any utility without hearing and without the opportunity for hearing would be inconsistent with the Public Utilities Code unless the consent of the utility was first obtained. Our rejection of the automatic reduction method stems not from any undue consideration for Pacific but from a due regard for statutory limitations."[29] (*Re Pacific Telephone and Telegraph Company* (1974) — Cal.P.U.C. — (Decision No. 83540, slip opn. p. 10).) We must therefore examine the legal bases of the commission's refusal to entertain the system proffered by its staff.

2. *The Public Utilities Commission failed regularly to pursue its authority in refusing to consider annual adjustment as an alternative rate setting system.*

The commission in these cases operated under a dual obligation to weigh and explain its actions in regard to the treatment of accelerated

---

[27]The staff witness indicated that annual adjustment ranked just behind pro forma normalization as a desirable alternative to normalization, which was the plan proposed by the utilities.

[28]Neither the real parties nor the commission has indicated the origin of the "understanding" to which the decision refers; any such understanding would in any case be irrelevant in light of our order on annulment to consider "alternative approaches" to the problem which accelerated depreciation posed for ratemakers. (*City and County of San Francisco, supra*, 6 Cal.3d 119, 130.) Parties may not by consent disregard directions of this court.

[29]In so ruling the commission seemingly assumed that annual adjustment conformed to Internal Revenue Code of 1954 section 167, subdivision (*l*)(3)(F) and Treasury Regulation, section. 1-167(*l*). Since the instant cases, of course, do not squarely present the question of the congruence of annual adjustment and the Internal Revenue Code, we do not address the issue. We note in passing that in concept, annual adjustment closely approximates annual ratemaking, and the Internal Revenue Code does not, of course, forbid such a procedure. (See Treas. Reg. § 1-167(*l*)-1(h)(6)(ii).)

depreciation. First, it acted, as always under the statutory obligations of insuring that all utility rates are just and reasonable (Pub. Util. Code, § 451), that no utility raises its rates unless the commission finds the increase justified (Pub. Util. Code, § 454), and that its decision "contain[s], separately stated, findings of fact and conclusions of law . . . on all issues material to the order or decision" (Pub. Util. Code, § 1705).[30]

In addition to these continuing statutory duties, the commission in the instant case was also bound by our order in *City and County of San Francisco v. Public Utilities Com., supra,* 6 Cal.3d 119, in which we annulled a tariff for the commission's "failure to consider lawful alternatives in calculation of federal income tax expense" (*id.,* at p. 130), and in which we indicated that the commission should consider available alternatives. Thus the commission labored under a two-fold obligation thoroughly to deliberate upon methods of dealing with a problem it had perceived.

In spite of these statutory and judicial obligations, however, the commission failed to consider an annual adjustment provision, a plan suggested by its hearing examiner, testified to by its staff, concerning which full cross-examination had occurred, and which, on the face of the record, appeared capable of relatively easy implementation. Speaking of a similar failure to consider relevant aspects of a decision, we recently explained "[t]he Commission may and should consider *sua sponte* every element of public interest affected by . . . [utility proposals] which it is called upon to approve. It should not be necessary for any private party to rouse the Commission to perform its duty . . . . Thus, we conclude that the Commission failed to give adequate consideration to the . . . issues . . . and that its decision must be annulled." (*Northern California Power Agency v. Public Util. Com.* (1971) 5 Cal.3d 370, 380 [96 Cal.Rptr. 18, 486 P.2d 1218]; accord, *City and County of San Francisco v. Public Utilities Com., supra,* 6 Cal.3d 119; *City of Los Angeles v. Public Utilities Commission, supra,* 7 Cal.3d 331.) If, as we have shown, unjustified failure to deliberate constitutes error, we must consider the grounds

---

[30]As Justice Traynor emphasized in the leading case construing the requirement of specific findings, a requirement added to the statute in 1961: "Even when the scope of review is limited, . . . findings on material issues enable the reviewing court to determine whether the commission has acted arbitrarily. . . . Findings on material issues can also serve to help the commission avoid careless or arbitrary action. . . . There is no assurance that an administrative agency has made a reasoned analysis if it need state only the ultimate finding . . . ." (*California Motor Transport Co. v. Public Utilities Com.* (1963) 59 Cal.2d 270, 274-275 [28 Cal.Rptr. 868, 379 P.2d 324].)

which the commission has proffered as justification of its refusal to consider annual adjustment.

In explaining its action the commission indicated that discussion of an annual adjustment clause would serve no purpose because Public Utilities Code section 728, which requires a "hearing" before the promulgation of rates, placed beyond its power a tariff which would automatically reduce rates without such a hearing.[31]

(a) *The Public Utilities Code permits the use of annual adjustment clauses.*

■ Section 728 of the Public Utilities Code simply provides that the commission "after a hearing" may adjust improper "rates, classifications, rules, practices, or contracts"; on its face, then, nothing in the statute is inconsistent with the use of an annual adjustment clause.

The commission and the utilities, however, impliedly assert that the terms "rates" and "hearing" in section 728 have extremely restrictive meanings which bar adjustment clauses. Their position depends upon the conception that a "rate" is a single set of unvarying fixed charges, and that a "hearing" must occur before each variation in those charges. Neither contention withstands scrutiny.

In the first place, longstanding commission practice in other areas refutes its position in these cases. As testimony in the instant proceedings revealed, the commission has for a number of years included fuel adjustment clauses in the tariffs of power companies on the grounds that the variation in their fuel costs is disproportionate to the variation in their other costs.[32] Thus the commission itself has long recognized adjustment clauses do not exceed its authority.

---

[31]The relevant sentence of Public Utilities Code section 728 reads as follows: "Whenever the commission, after a hearing, finds that the rates or classifications, demanded, observed, charged, or collected by any public utility for or in connection with any service, product, or commodity, or the rules, practices, or contracts affecting such rates or classifications are insufficient, unlawful, unjust, unreasonable, discriminatory, or preferential, the commission shall determine and fix, by order, the just, reasonable, or sufficient rates, classifications, rules, practices, or contracts to be thereafter observed and in force."

[32]*Re Southern California Edison Co. Ltd.* (1941) 43 C.R.C. 733; *Re Southern California Gas Co.* (1958) 56 Cal.P.U.C. 158; *Re California Electric Power Co.* (1958) 56 Cal.P.U.C. 221; see *Re Pacific Gas & Electric Company* (1971) 71 Cal.P.U.C. 724, 758-759; cf. *Riverside Cement Co.* v. *Public Util. Com.* (1950) 35 Cal.2d 328 [217 P.2d 403].

■ "Consistent administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight and will not be overturned unless clearly erroneous. (*Federal Trade Com.* v. *Mandel Brothers* [1959] 359 U.S. 385, 391 . . .; *United States* v. *American Trucking Assns.* [1940] 310 U.S. 534, 549 . . .; *United States* v. *Leslie Salt Co.* [1956] 350 U.S. 383, 396 . . .; *Great Northern Ry. Co.* v. *United States* [1942] 315 U.S. 262, 275-276 . . .; *Norwegian Nitrogen Co.* v. *United States* [1933] 288 U.S. 294, 315 . . .; *Mazer* v. *Stein* [1954] 347 U.S. 201, 213 . . .; see 1 Davis, Administrative Law Treatise, § 5.06, p. 324.)" (*DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 61-62 [13 Cal.Rptr. 663, 362 P.2d 487].) ■ Moreover, in the instant case no party presents any valid reason for holding this longstanding administrative interpretation unlawful.

In the face of this authority, the commission and the real parties in interest simply argue that the fuel adjustment clauses which it employs as a standard practice supply no precedent for the use of annual adjustment clauses for tax reserves. They urge that such clauses characteristically *raise* utilities' rates (as they have during the recent inflationary period) and therefore supply no authority for a clause which is expected to *reduce* rates.[33] In our opinion the objection is specious; the statutory language simply does not differentiate between the rate changes which increase rates and those which decrease rates,

Moreover, such consistent administrative practice accords with the conclusions of a sister court which, some 20 years ago, faced a question very similar to that which we now consider. In *Norfolk* v. *Virginia Electric etc. Co.* (1955) 197 Va. 505, 516-518 [90 S.E.2d 140], the Virginia Supreme Court addressed the contention that an annual adjustment clause could not be inserted in the tariff of a utility because the new rate would take effect without the 30-day notice to the public required by the relevant statute.

---

[33]During proceedings before the commission, Pacific raised the additional objection that power company fuel adjustment clauses supplied no precedent for the use of a tax reserve clause because the commission derived its power to use fuel clauses from Public Utilities Code section 454, not section 728. Section 454, however, merely exempts rate increases established pursuant to adjustment clauses from the new requirement that certain classes of utilities enclose with their regular billings all notices of rate increase applications. Only *common carriers* are exempted *additionally* from the requirement of a hearing before rate increases (Pub. Util. Code, § 454, subd. (b)). Thus section 454 establishes no exemption from section 728 for fuel clause increases; if, therefore, hearings are required before all rate changes under section 728, they are also required for fuel clause changes. As we have shown, however, such hearings are not requisite when they have occurred as to the general tariff including such adjustment clauses.

Rejecting this contention, the unanimous court wrote: "[T]he power of the Commission is not limited to the mere change of a particular rate that the public must pay for the service rendered by a public utility, but it has the power to change . . . any part of a filed schedule, rate, rule or regulation that in any manner affects the rates charged or to be charged. . . . '[R]ate schedules consist not merely of lists of rates in dollars and cents, but . . . they customarily include provisions that will in various ways affect the rates charged at the time of filing or to be charged thereafter.' [¶] The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the company. . . . [I]t is clear that notice is not required on each occasion there is a change in the ratepayers' bills, but that notice is required for every change in the filed schedules which are the underlying bases for the computation of those bills."

Finally, in addition to longstanding administrative interpretation and the judicial authority described above, the purpose behind the hearing requirement of section 728 demonstrates the permissibility of the annual adjustment scheme here at issue. The purpose of the hearing is to air the policy considerations behind various rate proposals and to establish controverted facts; as the commission's experience with fuel clauses has shown, a hearing serves no purpose when the only business at hand is the application of a mathematical formula to a figure definitively established by reference to the utilities' books. The legislative purpose behind section 728 is better served by a plenary consideration of the advantages and disadvantages of an annual adjustment clause than by a yearly charade attendant to its application.

(b) *The Constitution does not forbid the use of annual adjustment clauses.*

■■■ As noted, the commission and the real parties in interest additionally argue that because a tariff containing an automatic adjustment clause could result in a decreased rate which would take effect without a prior hearing attendant to a full rate proceeding, the resulting rate decrease would constitute a taking without due process, in violation of the Fourteenth Amendment of the United States Constitution. As we explain, however, this argument ignores the elaborate safeguards attending both the establishment of the accounting procedures which the utilities must use to produce the relevant figures and the full hearing which would accompany the establishment of the tariff containing the

adjustment clause. As we shall show, under the governing authorities, these safeguards render the use of annual adjustment clauses entirely constitutional.

■ Before discussing the specific objections to the adjustment clause, we review the constitutional standards which the United States Supreme Court has set forth for such rate proceedings. The court has long made it clear that within the regulatory context due process is a flexible concept, permitting expert administrative agencies broad latitude in adapting the specific regulatory needs of their jurisdictions.

■ Thus, in sustaining the actions of a federal regulatory agency against the complaint of a utility that commission procedures in setting rates had deprived it of a hearing, the court set forth the relevant due process criteria: "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end." (*Power Comm'n* v. *Pipeline Co.* (1942) 315 U.S. 575, 586 [86 L.Ed. 1037, 1049-1050, 62 S.Ct. 736]; accord, *R. R. Comm'n.* v. *Pacific Gas Co.* (1938) 302 U.S. 388 [82 L.Ed. 319, 58 S.Ct. 334]; *West Ohio Gas Co.* v. *Public Utilities Com'n.* [No. 1] (1935) 294 U.S. 63, 70 [79 L.Ed. 761, 768-769, 55 S.Ct. 316]; *Market Street R. Co.* v. *Comm'n.* (1945) 324 U.S. 548, 562 [89 L.Ed. 1171, 1182, 65 S.Ct. 770]; see *Norwegian Nitrogen Co.* v. *United States* (1933) 288 U.S. 294, 317, 319 [77 L.Ed. 796, 808, 809, 53 S.Ct. 350].)

■ With these precepts in mind, we consider the utilities' contention that the use of an annual adjustment formula exceeds constitutional bounds because it fails to provide the utilities with a prior hearing before each annual adjustment of rates occurs. As we explain, however, contrary to the utilities' assertions, procedural safeguards mark every stage of the adoption of the annual adjustment formula.

As we have already shown, the commission must hold a full hearing before the promulgation of a general rate tariff. (Pub. Util. Code, § 728.) At such a hearing, the company has the opportunity through testimony,

briefs, exhibits, and oral argument to inspect and challenge any formula proposed. (Pub. Util. Code, § 1705; Cal. Admin. Code, tit. 20, §§ 52, 59-61, 64, 68-70, 75-76.) The utility may at that hearing raise its objections either to the general concept of an adjustment clause or to the particular one proposed. It can point to states of fact on which the formula might yield an unjust or undesirable result and suggest corrective modifications. Indeed Pacific, at whose hearing annual adjustment was most fully developed, in fact took advantage of most of the procedural rights just enumerated. Under the circumstances, the promulgation of an annual adjustment formula as part of a general utility tariff obviously comports with due process; it remains therefore only to consider if the periodic application of the formula to the figures in the utility's books entails any denial of due process.

The adjustment clause would operate upon figures which the utilities had placed in their account books in accordance with the system of accounts as to which the companies had received another, prior hearing. (Pub. Util. Code, §§ 792, 794.)[34] The utility, of course, would have made the entries with the full knowledge that the commission would employ them in connection with the annual adjustment clause.[35] Having thus obtained the appropriate figures from the utilities' accounts (cf. Pub. Util. Code, § 791), the commission would proceed to apply them to the formula as to which the utility would have enjoyed ample opportunity to make its objections known at a full hearing. (Pub. Util. Code, § 728; Cal. Admin. Code, tit. 20, §§ 51-88.) The insertion of numbers derived[36] from

---

[34]Empowered by law to "establish a system of accounts to be kept by the public utilities subject to its jurisdiction" (Pub. Util. Code, § 792), the commission has, when appropriate, held hearings on the establishment of such uniform accounts. (See *In re Uniform System of Accounts* (1948) 48 Cal.P.U.C. 253; *First Supplemental Order* (1957) 55 Cal.P.U.C. 668; cf. Pub. Util. Code, § 793; 64 Cal.P.U.C. 27; 70 Cal.P.U.C. 470.) Having established such accounting systems, the commission may prescribe the manner in which the regulated utilities employ them, but only after granting the utilities an opportunity to be heard on this question. Public Utilities Code section 794 provides that: "[t]he commission may, *after notice, and hearing* if requested within 15 days after receipt of notice, prescribe by order the accounts in which particular outlays and receipts shall be entered, charged or credited." (Italics added.) The commission's decision after such a hearing is of course subject both to rehearing and to judicial review. (Pub. Util. Code, §§ 1731, 1756.)

[35]Such figures might include both already incurred tax expenses and the utilities' own estimates of future tax expenses. The staff member testifying most extensively as to the annual adjustment method indicated that it might be desirable to confirm the figures for tax expenses with those reported to the utility's stockholders under the reports required by the federal Securities and Exchange Commission.

[36]As in the case of fuel clauses, the commission may find it necessary to make minor adjustments in the raw figures derived from the utilities' books before applying them to the annual adjustment clause. In light of the protections attending the development and use of the clause, we perceive no constitutional significance to flow from this practice.

an accounting system adopted at one hearing, into a formula approved at another hearing does not deny due process; the Fourteenth Amendment to the United States Constitution does not prohibit arithmetic.

Our holding accords with the authorities. Most closely in point is the decision of the Virginia Supreme Court, which faced, in addition to the statutory issues discussed above, a claim by ratepayers that a fuel adjustment clause would deprive them of due process because it did not afford them notice and hearing as to each of its applications; the court rejected the claim.[37] (*Norfolk* v. *Virginia Electric, etc. Co., supra,* 197 Va. 505.)

In so holding, the Virginia court spoke to the issue before us; after pointing to the widespread adoption of such clauses and their survival of legal challenges, it succinctly refuted the claim that their application constituted a denial of due process: "The City next contends that the escalator clause results in a denial of procedural due process of law to the consumers because there is no public notice and hearing on each occasion when the actual rate is increased. . . . In the instant case there was sufficient notice to the public that the Commission would hold a formal hearing on the application of the Company to determine whether it was just and reasonable to insert the escalator clause into its filed schedules. The City appeared and participated in the proceedings and after an investigation by the Commission and a full hearing, the Commission found as a fact that the proposed escalator clause was 'just and reasonable', a finding which the record does not warrant us in reversing. Consequently, the requirements of procedural due process have been fulfilled in this case. See, e.g., Railroad Commission of State of California v. Pacific Gas & Elec. Co. [1938] 302 U.S. 388 . . .; Ohio Bell Telephone Co. v. Public Utilities Comm. [1937] 301 U.S. 292 . . ." (*Norfolk* v. *Virginia Electric, etc. Co., supra,* 197 Va. 505, 516-518.)

*Norfolk* thus stands for the proposition that due process requires adequate hearings at the significant point of the adoption of the adjustment clause, rather than at the relatively unimportant occasions of its application. Measured by this standard, the system of annual adjustments proposed by the hearing examiner and the commission staff would offend no tenet of due process.

---

[37]The court in considering the ratepayers' claims assumed that they stood entitled to due process in connection with any increase in their rates; the utilities in the instant cases can therefore derive little comfort from the circumstance that the customer rather than the utility raised the due process claim.

This conclusion finds additional support in cases which have addressed the question whether due process requires that agencies afford regulated entities a hearing before acting on the basis of figures or data supplied to the agency by the utility itself. The question is relevant to the instant case, because the annual adjustment clause would operate upon figures entered by the utilities upon its own books. The utilities claim that due process entitles them to a hearing prior to the use of such figures; the authorities do not support this contention.

In a leading case a unanimous United States Supreme Court rejected the contentions of a California utility that the commission had denied it due process by using, as its rate base, the figure for which the utility had offered to sell itself to the city in which it was located. (*Market Street R. Co.* v. *Comm'n., supra,* 324 U.S. 548.) The railway argued that the use of this figure, which had found its way into evidence incidentally, and which the commission had not indicated it would use to fix the utility's value, denied it due process absent an opportunity to present argument concerning the accuracy and interpretation of the figure. The Supreme Court found the argument without merit; Justice Jackson, writing for the court, noted that the figure in question had been admitted into evidence without limitation as to use: "Doubtless the decision and the grounds of decision were unexpected. But surprise is not necessarily want of due process." (*Id.,* at p. 558 [89 L.Ed. at p. 1180].)

Nothing in the operation of the annual adjustment clause as here proposed even approaches the procedure which generated the utility's complaint in *Market Street Railway;* unlike the railway, the telephone companies would at all times know the use to which the commission intended to put the tax reserve figures and would have an ample opportunity to make known their views of such proposed use.[38] (See *American Toll Bridge Co.* v. *Railroad Com.* (1938) 12 Cal.2d 184, 203-204 [83 P.2d 1].)

As further demonstration of the annual adjustment clause's impregnability to constitutional attack, we briefly contrast its operation with

---

[38] In a case similar to *Market Street Railway,* an Emergency Court of Appeals rejected a claim by a manufacturer subject to the authority of the Office of Price Administration. The administrator, in fixing the price on regular building blocks sold by the manufacturer, had calculated the manufacturer's cost by subtracting from a figure previously supplied by the plaintiff for blocks with special features the sum claimed to be attributable to such special features. (*Schiefla* v. *Clark* (E.C.A. 1947) 163 F.2d 685.) The court held that the use of the plaintiff's own figures did not constitute a denial of due process even though the manufacturer had received no prior notice of the purpose for which the administrator might use the figures.

regulatory procedures which have *failed* to survive judicial scrutiny under the due process clause. The utilities insist that these cases pose an insuperable constitutional barrier to the use of an annual adjustment clause; we shall show, however, that they are in fact entirely distinguishable. In *Ohio Bell Tel. Co.* v. *Comm'n., supra,* 301 U.S. 292, the commission had, without informing the utility of its intention to do so, taken judicial notice of a general decline in the prices of property and then adjusted downward the values of particular utility properties, all without telling the utility of the method by which it arrived at its figures or permitting it to challenge them; the court held this procedure unconstitutional.

Without belaboring the obvious differences between the unconstitutional procedure in *Ohio Bell* and that proposed in the case of annual adjustment, we simply note that in the latter instance the operative assumptions of the commission would at all times be known to the parties. (Accord, *Moore-McCormack Lines, Inc.* v. *United States* (1969) 413 F.2d 568, 585 [188 Ct. Cl. 644].)

In striking down the procedure in *Ohio Bell* the court made reference to an earlier case upon which the utilities before us rely; *West Ohio Gas Co.* v. *Comm'n.* [No. 2], 294 U.S. 79 [79 L.Ed. 773, 55 S.Ct. 324], epitomized the defects also found in *Ohio Bell.* In *West Ohio* the regulatory agency had, in setting a rate in 1933, chosen to rely exclusively on data from 1929, ignoring available revenue and expense data from 1930 and 1931; the court held this procedure unconstitutional.

In examining the flaws in *West Ohio* one is struck by the contrast they present to the proposed annual adjustment clause in question, in spite of the utilities' assertion to the contrary. The defect in the *West Ohio* case lay in the commission's refusal to consider the latest available data as to costs and revenue; yet annual adjustment entails precisely the substitution of actual figures for guesses and estimates of tax expense and deferred reserves. Rather than taking a single year as the measure of tax reserves, the commission staff proposed to make period adjustments in the figures in the light of actual experience, precisely the course approved by the court in *West Ohio.* The utilities, of course, complain that the commission would make such adjustments only in the tax deferral figures, and not in the other revenues and expenses of the company; but, as we have already shown, the distinctive treatment of tax expenses and reserves finds its warrant in the circumstance that under accelerated depreciation they will vary abnormally with respect to the

other components of the utilities' finances. Simply to recognize this fact is not to deny due process.

Nor does due process require a hearing that serves no useful purpose. In the instant case the only relevant inquiry turns upon the figures that stand in specified places in the utilities' books. No facts are open to serious dispute, no witnesses' demeanor need be judged, no policy decisions on which public sentiment might prove useful are before the commission. Within such a context, the facts are those which Professor Davis terms "legislative," and as to which a hearing serves no function.[39] (1 Davis, Administrative Law Treatise (1958) pp. 429-437 (1970 Supp.) pp. 327-329; *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576 [71 Cal.Rptr. 739].)

The crux of the utilities' objections to annual adjustment lies in the possibility that under certain circumstances the annual adjustment clause might yield a rate below their authorized return, or in extreme situations, they assert, on the border of confiscation. The crucial point which they fail to discern, however, is that *any rate may have such an effect, no matter how calculated.*

An entirely fixed and stable rate may, if expenses rise dramatically, yield insufficient revenues to guarantee the utility a reasonable return. Yet we have never viewed this possibility as a ground for constitutionally requiring expense escalation clauses; the appropriate remedy in such instances is an application for a rate increase (Pub. Util. Code, §§ 454, 455). Conversely, the fact that a tariff containing an annual adjustment clause keyed to the growth of a deferred tax reserve may, under imaginatively conceived circumstances, reduce the rate of return below that authorized does not render it unconstitutional.

The utilities' objections are therefore inapposite. The due process cases they cite are, as we have shown, concerned with procedural defects not here present. Nothing in the procedures suggested to the commission will deny the utilities full hearings both on the system of accounts which will yield the figures in question and on the formula to which the figures will be applied.

---

[39]Nothing we say, of course, would preclude the commission from permitting the utilities to submit written briefs at the time of the annual adjustment, if the commission thinks such a procedure useful. Under the circumstances, however, this practice is not constitutionally mandated. (Cf. 1 Davis, Administrative Law Treatise (1970 Supp.) p. 332; *Dyke Water Co.* v. *Public Utilities Com.* (1961) 56 Cal.2d 105 [14 Cal.Rptr. 310, 363 P.2d 326], cert. den., 368 U.S. 939 [7 L.Ed.2d 338, 82 S.Ct. 380].)

(c) *The commission therefore erred in failing to consider annual adjustment.*

Because annual adjustment comports both with the governing statutes and the Constitution, the commission failed regularly to pursue its authority in failing to consider it.[40] (Pub. Util. Code, § 1757.) On remand the commission should proceed either to take further testimony on the system, or to consider its adoption on the basis of the testimony contained in the record of the instant cases.[41] It should in any case weigh its desirability and set forth the reasons for the decision it ultimately reaches.[42] (Pub. Util. Code, § 1705.)

[40]In its opinion on denial of rehearing in the Pacific case the commission set forth an alternative proposal which entailed its reception of periodic reports of the utilities' profits with an eye towards reopening proceedings should they exceed the authorized rate. (*Re Pacific Telephone and Telegraph Co.* (1974) — Cal.P.U.C. — (Decision No. 83540).) The commission subsequently adopted the same procedure for General. (*Re General Telephone Company* (1974) — Cal.P.U.C. —. (Decision No. 83779, slip opn., pp. 29-31.)) While such continuing supervision appears to be in commendable accord with the commission's statutory duties (Pub. Util. Code, §§ 451, 701, 728), it fails to serve as an adequate substitute for the consideration of annual adjustment on two grounds. First, the holding out of the possibility of future action does not constitute a justification for failure to take present action. Second, the commission's procedure verges dangerously on shifting the burden for justification of rate increases from the utility, where Public Utilities Code section 454 places it, to the ratepayer. The commission's order on denial of rehearing therefore does not alter the outcome of the instant case.

[41]Pacific, of course, has had a full hearing on the use of annual adjustment, and as to it the commission enjoys the election described. In the General proceedings, the commission, although under a duty to do so, did not consider annual adjustment, and General consequently stands entitled to a hearing before incorporation of the system into its rates.

[42]In this connection we emphasize that nothing in the course of this opinion should be construed as binding the Public Utilities Commission either now or in the future to any *particular* method of rate-setting which it decides is not useful. For instance, because the size of the utility's reinvestment is affected by the rate of inflation in the entire economy, under certain severe conditions of deflation even a utility expanding its plant investment would not incur sufficient expense (because the replacements would cost substantially less than the old assets) to offset the lower depreciation attributable to "old" assets in their later years. Under *such* conditions a public regulatory commission might well adjust its rate-setting assumptions. (Cf. *Power Comm'n. v. Hope Gas Co.,* 320 U.S. 591 [88 L.Ed. 333, 64 S.Ct. 281]; *Bluefield Co. v. Public Serv. Com.* (1923) 262 U.S. 679, 692-693 [67 L.Ed. 1176, 43 S.Ct. 675].) Thus, should conditions change, or should the commission in the *considered* exercise of its discretion (Pub. Util. Code, § 1705) conclude that a method which we hold it empowered to employ is not suitable, it may reject the method.

Conversely, should the commission on remand decide that a method which it has previously rejected on prudential grounds now appears feasible, it may adopt the method. Thus, if, upon reconsideration, the commission should conclude to implement pro forma normalization on a tentative basis, with rates held in a trust fund, subject to refund upon final determination of federal tax questions, nothing we say here should be construed to forbid such a course of action. Alternatively, the commission could choose to mitigate the "windfall" accruing to real parties in interest in consequence of their

### 3. *The commission did not otherwise err.*

In the decisions before us the commission ruled as to a number of points other than those already discussed; the petitioning cities complain of several of these rulings. We have carefully examined both the petitioners' contentions and the record before the commission and find no error calling for annulment other than that indicated above.[43] (Pub. Util. Code, § 1757.) We dwell further on only one point which, because it relates to commission procedure, may recur.

■ The petitioning Cities of Los Angeles and Long Beach (in S.F. 23237) complain that the commission erred in failing to abrogate General's entire tariff after we annulled Pacific's tariff in *City and County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119. In order to show that the commission did not err, we briefly set forth the relevant chronology.

When we disapproved the commission's order in *City and County of San Francisco,* the commission had just filed a decision incorporating a rate increase for General Telephone, based in part on the same treatment of federal tax expenses which we held erroneous in the *Pacific* case. (*Re General Telephone Co. of Cal.,* 72 Cal.P.U.C. 652.) Upon learning of our decision in *City and County of San Francisco* the cities which had appeared before the commission in the proceeding leading to the General decision, petitioned for a *rehearing* which the commission granted. (Decisions Nos. 79532 and 79367.) We subsequently annulled the entire rate based on the tax decision held erroneous in *City and County of San Francisco.* (*City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331.)

In granting rehearing the commission limited the issues to the question of tax expenses and promulgated the previous tariff as an *interim* rate subject to refund if the commission subsequently found it erroneous. After this rehearing (at which the commission did not consider annual

---

failure to elect accelerated depreciation prior to 1969, by setting more modest rates of return in recognition of the additional source of capital available to the utilities by virtue of the federal tax laws.

We rule only on the *availability* of a method of remedying a serious problem perceived by the commission, a method whose usefulness the commission tacitly conceded, but which it declined to consider, solely because it believed itself powerless to implement.

[43]As noted above, we do not in so holding endorse or pass upon the legal merits of the commission's interpretation of the 1969 amendments to the Internal Revenue Code and the regulations interpreting them.

adjustment), it effectively reaffirmed the interim rates as part of the permanent tariff.

From the previous discussion, it is clear that as a substantive matter the commission erred in failing to consider annual adjustment.[44] The petitioning cities also complain, however, that the commission erred in repromulgating the tariff under attack as an *interim* rate; by analogy to our action in *City of Los Angeles* they argue that the commission bore the duty to annul the *entire* rate. Because the rates suffered from the same failure to consider alternatives, they argue, both rates must have been annulled. In this analogy between our decision and the commission action, however, lurks a fatal flaw.

The key to the distinction between the two cases lies in the difference in the commission's power, on one hand, to *reopen* proceedings already final, and, on the other, to *rehear* a decision not yet final. In *City of Los Angeles* we annulled the tariff in question, in spite of the fact that the commission had *reopened* rate proceedings under Public Utilities Code section 1708. That section, which we set forth in the margin,[45] permits the commission at any time to reopen proceedings even after a decision has become *final,* as the commission decision in *City of Los Angeles* would have been had we not annulled. (*City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331.)

In that case we explicitly based our annulment on the decision's finality: "It follows that, unless the rate order now before us is annulled, it will *become a lawful rate* and that all funds collected pursuant to it would belong to Pacific and not be subject to refund. [¶] In other words, we must annul the rate order now before us, because otherwise the rates therein, which are based in part on the annulled tax expense decision, will *become lawful rates* for the future and will preclude refunds." (*Id.,* p. 338; italics added.)

---

[44]Because the commission took the steps just outlined, we were not called upon to annul General's rate as we had that of Pacific in *City and County of San Francisco.* The governing law, however, was clear from that case, and the commission bore a corresponding similar duty to consider alternative methods of dealing with General's accumulating tax reserves. Annual adjustment was before it in the parallel proceedings after annulment in the Pacific case, which was filed before the decision on rehearing in the General case.

[45]"The commission may at any time, upon notice to the . . . parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter, or amend any order or decision made by it. Any order rescinding, altering, or amending a prior order or decision shall, when served upon the . . . parties, have the same effect as an original order or decision." (Pub. Util. Code, § 1708.)

In the General case, on the other hand, the time for *rehearing* had not expired and the rate had not become final and lawful. The difference in effect stems from the difference between Public Utilities Code section 1736,[46] which provides for an order on *rehearing,* and section 1708 which provides for *reopening.* The former procedure, which must take place within the time limits specified in section 1731, and only in response to parties' requests, contrasts with the latter, which is merely a general authority for the commission to reconsider something upon which it has previously ruled. Rehearing, unlike reopening, prevents an order previously made from becoming final. (See *Sale* v. *Railroad Commission* (1940) 15 Cal.2d 612, 616 [104 P.2d 38].) Because the commission *reheard* the General case, its order did not become final, and it could promulgate an interim rate subject to refund. The commission's procedure in Decision 83778 was therefore lawful although its substantive result must be annulled for failure to consider annual adjustment.

4.   *Order.*

Because the commission has failed regularly to pursue its authority, the rates here under review may not stand in their entirety. (Pub. Util. Code, § 1757.) Yet, because we have found error only in respect to the treatment of tax expenses, we need annul only the portion of the rate based on such error. Unlike the situation facing us in *City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331, in which we noted that "[n]o basis appears to sever these matters from the increase of rates ordered by the commission, and it is not claimed that severance is possible" (*id.* at pp. 353-354), the commission in the instant case has gone to some lengths to "set out the dollar effect of the adjustment so that if . . . [it is] found wrong . . . the correct adjustment can readily be made." (*Re Pacific Telephone and Telegraph* (1974) — Cal.P.U.C. — (Decision No. 83162, slip opn. p. 64).)

Not only such passages but also the commission's actions in these cases demonstrate the severability of the tax related aspects of the rates before

---

[46]Section 1736 reads in its entirety as follows: "If, after such rehearing and a consideration of all the facts, including those arising since the making of the order or decision, the commission is of the opinion that the original order or decision or any part thereof is in any respect unjust or unwarranted, or should be changed, the commission may abrogate, change, or modify it. The order or decision abrogating, changing, or modifying the original order or decision shall have the same force and effect as an original order or decision, but shall not affect any right or the enforcement of any right arising from or by virtue of the original order or decision unless so ordered by the commission."

us. Thus upon rehearing in the General case, the commission discovered that California taxes, unlike their federal counterparts, were amenable to flow-through treatment and ordered appropriate refunds, thereby demonstrating the practicability of partial annulment. (*Re General Telephone of California* (1974) — Cal.P.U.C. — (Decision No. 83778, slip opn. pp. 48-49).)

In order, therefore, not to interfere with those portions of the tariff in which we find no reversible error, we affirm the commission's order except insofar as it depends upon the erroneous treatment of tax expenses set forth above; as to that portion of the rate we annul. The commission, on remand of this matter for further proceedings consistent with this opinion, shall expeditiously determine what position it will adopt with respect to the tax expense issue. (See *City and County of San Francisco* v. *Public Utilities Com., supra,* 6 Cal.3d 119, 130-131.) Having ascertained this position, be it annual adjustment or some other alternative, including the possibility of a commensurate adjustment in the rate of return, the commission shall provide for refunds, if appropriate, to the ratepayers of the difference between such a rate and the tariff reviewed herein.

Wright, C. J., McComb, J., Mosk, J., Clark, J., Richardson, J., and Taylor, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.