IN THE MATTER OF THE REVISION OF RATES FILED BY REDI-FLO CORPORATION OF NEW JERSEY INCREASING ITS RATES.

STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, APPELLANT, v. REDI-FLO CORPORATION, A CORPORATION DOING BUSINESS IN THE STATE OF NEW JERSEY; DEPARTMENT OF PUBLIC UTILITIES, BOARD OF PUBLIC UTILITY COMMISSIONERS, RESPONDENTS.

Argued March 21, 1977—Decided April 6, 1978.

---

*only as to § II of the majority opinion.

22

*Mr. R. William Potter,* Assistant Deputy Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate, attorney; *Mr. Potter* and *Mr. William Gural,* Director, Division of Rate Counsel, of counsel and on the brief).

*Mr. Jack B. Kirsten* argued the cause for respondent Redi-Flo (*Messrs. Kirsten, Solomon, Friedman and Cherin,* attorneys; *Mr. Kirsten* and *Ms. Deborah W. Babcox,* on the brief).

*Mr. Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for respondent Board of Public Utility Commissioners (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Goltz,* on the brief; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

*Messrs. Rosen and Weiss* submitted a brief on behalf of *amicus curiae* N. J. Utilities Association (*Mr. Howard T. Rosen*, of counsel; *Mr. William Balcerski* on the brief).

*Mr. Walter P. Roura* submitted a brief on behalf of *amicus curiae* Assemblyman Richard Van Wagner.

The opinion of the court was delivered by

PASHMAN, J. This is an appeal taken by the Department of the Public Advocate from that portion of an order issued by the Board of Public Utility Commissioners (The Board) authorizing the Redi-Flo Corporation (Redi-Flo) to incorporate an automatic "fuel adjustment clause" into its permanent tariff. The Board's order, dated July 10, 1975, modified two earlier decisions in which it had granted a measure of rate relief to Redi-Flo in the form of increased rates but had refused to approve its proposed fuel adjustment clause. In challenging this action, the Public Advocate takes the position that the statutes governing the Board's rate setting authority (*N. J. S. A.* 48:2–21, 48:2–21.1 and 48: 2–21.2) permit such clauses only as an interim measure. In addition, he attacks particular features of Redi-Flo's fuel adjustment clause, arguing that the Board erred in overturning its earlier orders which had denied such relief.

The Attorney General, appearing on behalf of the Board, and the New Jersey Utilities Association, appearing as *amicus curiae,* have joined Redi-Flo in urging affirmance of the order below and ratification of the Board's authority to approve fuel adjustment clauses as a permanent part of its tariff. In order to expedite consideration of this important issue, we granted a motion by the Public Advocate to certify this appeal directly while it was pending unheard in the Appellate Division. 71 *N. J.* 535 (1976).

I

A necessary preface for an understanding of the issues presented by this case is a description of Redi-Flo's operations and the procedural history of this matter.

Redi-Flo is a New Jersey corporation whose stock ownership is equally divided between Rele, Inc., a closely held family concern which manages its operations, and Amerada Hess Corporation, a major oil firm which provided much of Redi-Flo's original financing and currently supplies it with fuel oil for resale to customers. Redi-Flo distributes fuel oil by means of a system of underground pipelines to some 1,300 residences in a planned retirement community known as Holiday City, located in Dover Township, Ocean County.[1] When the Holiday City system was originally planned in 1965, Redi-Flo's founders viewed it as a model for similar distribution systems to be constructed in other housing developments in New Jersey and throughout the country. Their hope was that this "modern" form of fuel oil distribution would prove an attractive alternative to the existing system of individual oil truck delivery by eliminating the risk of late deliveries and accidental oil leakages.

However, the economic downturn in the construction industry and the fuel oil shortage combined to abort these plans for expansion, leaving the Holiday City installation as the company's only project. And this system, which was based on a novel technology, proved to be far more costly than expected as technical difficulties developed and led to expensive repairs. Consequently, the economic benefits the company had anticipated would result from decreasing marginal costs for new customers never materialized. Its financial position was further weakened by a slow attrition in the number of customers and a dual pricing scheme based on individual consumer contracts and Board regulation.

---

[1] The company's facilities consist of four storage tanks with a total operating capacity of 60,000 gallons, a central pumping station and a network of distribution mains in the streets of Holiday City. The individual residences receive the oil by means of service connections running from the distribution mains. There are meters attached to the service connections which record consumption. Redi-Flo offers a billing plan which allows customers to read their own meters and make monthly payments.

When Redi-Flo began operations in 1965, it entered into a standard contract with each of the Holiday City residents who chose to link up with its system.[2] Under this agreement, which was renewable annually, Redi-Flo promised to supply fuel oil at a per gallon price not to exceed the average retail price of major oil distributors in the area or a maximum price set on June 1 of each year. The Company also promised to install a fuel oil tank and a fully operative heating system in the home of the consumer if it ever chose to discontinue service. In the event the consumer chose to terminate the agreement, he was to bear the expense of switching to another system. In addition, under a separate contract the company offered a comprehensive service plan guaranteeing part replacements and servicing of burners on a 24-hour basis.

The second level of price regulation was imposed in 1970 when the Board, having successfully asserted its jurisdiction over Redi-Flo as a public utility, see *In re Petition of N. J. Natural Gas Co.*, 109 *N. J. Super*. 324 (App. Div. 1970), certif. den. 56 *N. J.* 475 (1970), required the company to file a tariff of its rates and charges. See *N. J. S. A.* 48:2–21(a). This tariff, however, reflected the company's contractual commitments by setting a ceiling on prices for each 12-month period beginning June 1 and requiring a credit to consumers for any excess charges over the average retail price of local distributors for the same period. The Board permitted Redi-Flo to continue its practice of announcing a new ceiling on prices on June 1 of each year,

---

[2]The details of the company's early phase of operations are set forth in *In re Petition of N. J. Natural Gas Co.*, 109 *N. J. Super*. 324 (App. Div. 1970), certif. den. 56 *N. J.* 475 (1970). The account there indicates that Rele, Inc. owned the distribution system until 1968 and entered into the contracts with individual consumers. *Id.* at 327–329.

At that time Holiday City consisted of some 900 residences, which came to be referred to as Phase I. The development has since constructed a second cluster of homes, referred to as Phase II.

which was incorporated into a revised tariff filed in accordance with the Board's procedures.

The rigidities of this pricing scheme painfully affected Redi-Flo when the oil embargo in the fall of 1973 caused the wholesale price of fuel oil to skyrocket. The maximum retail price of $.239 per gallon for the year beginning on June 1, 1973 had been set when the wholesale price was roughly $.14 per gallon. Over the course of 1973-74 the company's costs for fuel oil almost doubled, reaching a wholesale price of $.267 per gallon on May 31, 1974. Thus, Redi-Flo eventually found itself in the position of sustaining a loss on every gallon of fuel oil sold to its customers. Over the course of that year, its gross profit on sales of fuel oil fell from $63,918 to $12,310, and its net operating loss rose from $53,621 to $99,830.[3]

By the spring of 1974 Redi-Flo's finances were thoroughly debilitated. However, the company chose not to seek rate relief from the Board before the end of its fiscal year, May 31, apparently because of its contracts with individual consumers. As noted previously, in prior years, the Board had permitted the company to file revised tariffs without full-scale rate proceedings, and the company assumed that it would be able to increase its rates in the same manner on June 1, 1974. However, the Board, concerned by the volatile nature of the fuel oil market, proved unwilling to permit this procedure. After discussions with company officials, it directed Redi-Flo to file a formal petition for rate relief seeking Board approval of any increases in charges to customers.

---

[3]The company's fiscal year ended on May 31, 1973. The figures for the year 1973-74 reflect its performance for the year ending on March 31, 1974, which was the year preceding its filing of a petition with the Board. The company's losses actually were greater for the fiscal year ending May 31, 1974 because its revenues from sales of fuel oil were less than its costs of fuel oil in April and May 1974.

On April 27, 1974, the company filed such a petition with the Board. It sought to increase the maximum retail charge from the existing level of $.239 per gallon to $.3668 per gallon of fuel oil, effective June 1. It also requested permission to adopt a fuel adjustment clause which would allow the company to raise the maximum price by the amount of any increase in wholesale fuel oil costs. The fuel adjustment clause also provided for lower retail charges corresponding to decreases in wholesale costs.

On May 16, 1974, the Board issued an order suspending the effective date of the new tariff until October 1, 1974,[4] and setting the matter down for a public hearing on May 24. Rate counsel[5] participated in the proceeding and several spokesmen for Holiday City residents testified.

Redi-Flo had filed its petition for rate relief under *N. J. S. A.* 48:2–21.2(a), a special statutory rate-making provision which permits the Board to dispense with a rate base determination when it finds (1) that the utility sustained a net operating loss over the preceding 12 months and (2) that the proposed increase in rates will not yield a net op-

---

[4]*N. J. S. A.* 48:2–21(d) authorizes the Board to suspend any "increase, change or alteration", in existing rates until it has approved the proposed tariff as "just and reasonable" after conducting a hearing. The duration of the suspension is limited to four months, unless the Board elects to extend the suspension for another four months during a hearing and consideration of the utility's increase.

*N. J. S. A.* 48:2–21(d) further provides that "[t]he board shall approve the increase, change or alteration upon being satisfied that the same is just and reasonable."

[5]The statute establishing the Division of Rate Counsel within the Department of the Public Advocate (*N. J. S. A.* 52:27E–16) did not become effective until June 12, 1974. *L.* 1974, *c.* 27, § 51. As a result, the Attorney General appointed rate counsel under his existing authority. *N. J. S. A.* 48:2–31.1. The Public Advocate did not enter this litigation as rate counsel until after the Board filed its third and final order on July 10, 1975.

erating profit over the next succeeding 12 months.[6] It submitted financial statements showing a net operating loss of $99,830 for the 12-month period ending on March 31, 1974 and projecting a net operating loss of $10,700 for the following year under its proposed rates. (It estimated that its operating losses would total $148,250 under the existing schedules of rates.)

At the hearing, Redi-Flo's representatives explained that they had decided not to seek a specific rate of return on the company's investment because their calculations had shown that a rate base-rate of return approach would result in a retail price far above the competitive price of fuel oil. As an alternative method of setting prices, they suggested that the Board peg the company's charges to the

---

[6] *N. J. S. A.* 48:2-21.2 provides in pertinent part:

> In arriving at any determination as to the justness or reasonableness of any existing rate, fare or charge or in prescribing a just and reasonable rate, fare or charge, the board shall not be bound:
>
> 1. To find a rate base, if it determines that
>
> (a) the applicable operating expenses plus depreciation and taxes of conducting the business, for which the rate, fare or charge is established, computed on the basis of the 12 months next preceding the month in which the proceeding is initiated, exceeds the revenue from such operation, during said period, under the existing rates, fares or charges and that the revenue under the proposed increased rates, fares or charges will not exceed such operating expenses, depreciation and taxes,
>
> \* \* \* \* \* \* \* \*
>
> When the board shall prescribe a rate, fare or charge without finding a rate base, it shall, in its determination, make a finding of the facts on the basis of which it prescribed such rate, fare or charge.

The conventional procedure involves the establishment of a rate base reflecting the fair value of the utility's useful property, the calculation of allowable operating expenses, the computation of net income, the determination of a fair rate of return and the design of a proper rate schedule to produce reasonable revenues. *In re Intrastate Sand Rates*, 66 *N. J.* 12 (1974); *State v. New Jersey Bell Telephone Co.*, 30 *N. J.* 16 (1959); *Public Service Coordinated Service Trans. v. State*, 5 *N. J.* 196 (1950).

average retail price of independent oil dealers in the local area. Taking data from six major oil distributors, they calculated that the average price was $.3668 per gallon. They proposed this figure as the maximum charge under the tariff and also advocated a provision whereby consumers would receive a credit at the end of the year for any amount by which Redi-Flo's charges exceeded the actual price charged by other distributors. To complement this provision for decreasing charges, they also proposed a fuel adjustment clause which would permit Redi-Flo to increase its prices by the amount of any rise in the wholesale cost of fuel oil. In no event, however, could the company exact a charge which exceeded the average price of other distributors.

The main thrust of the company's presentation was the urgent need for immediate rate relief. It stressed that Amerada Hess was no longer willing to supply fuel without current payments, as it had done in the past, and warned that denial of adequate relief would imperil the ability of the company to continue service. Therefore, it also presented a petition for interim rate relief (*N. J. S. A.* 48: 2–21.1) pending a decision by the Board which would authorize implementation of the proposed tariff on June 1, 1974.

Neither rate counsel nor the consumer representatives denied that some increase in rates was warranted. However, they asserted that the proper yardstick for establishing fair charges was the rate schedule of Homoil Company, a regulated utility which operated a distribution system of underground pipelines similar to that of Redi-Flo. They argued that a bulk supplier like Redi-Flo enjoyed economies of scale which should have enabled it to undersell local oil dealers. In addition, they pointed out that Redi-Flo enjoyed an extra advantage because of its close relationship with its supplier of fuel oil, Amerada Hess.

The Board took no immediate action on the request for interim rate relief, choosing to wait until September 12, 1974 to issue a final Order on Redi-Flo's petition for perma-

nent rate increases. This order recited the Board's agreement that some form of rate relief was needed in light of the company's overall financial condition and that a rate base-rate of return approach was not suited to setting its rates. However, the basic features of the Board's determination reflected its disagreement with Redi-Flo's proposals.

After reviewing the details of the suggested tariff, the Board summarily rejected the request for a fuel adjustment clause in two sentences:

We have reviewed the record in the instant proceeding and are not satisfied that the petitioner has established the necessity for or need for a fuel adjustment clause. If petitioner is faced with what it contends are substantial increases in the cost of oil from its supplier (Amerada Hess), appropriate and timely filing with this Board, supported by adequate proofs, is [sic] the vehicle for correcting such problems.

The Board made no findings concerning Redi-Flo's losses over the previous year or its projection of losses under its proposed tariff. However, it found no need for a rate base determination as a prerequisite for setting rates because Redi-Flo's representatives had testified that this approach would produce·a higher rate than the one requested, with charges far above the prevailing fuel oil prices. Following the suggestion of rate counsel, it decided to fix the utility's rates by allowing Redi-Flo the same spread between the wholesale cost of fuel oil (plus transportation charges) and the retail price currently enjoyed by the Homoil Company. This resulted in a maximum charge of $.3260 per gallon of fuel oil, considerably below the company's request of $.3668. The Board justified this treatment by invoking its regulatory experience with Homoil's similar operations and by noting the lack of persuasive proof that Redi-Flo's operating expenses were at a reasonable level. It also cited the company's relationship with Amerada Hess as one reason justifying its expectation of lower charges by Redi-Flo than those exacted by other fuel oil distributors in the

area. It specifically found that the proposed rates were "unfair and unreasonable" and that new rates were "sufficient to allow [Redi-Flo] to maintain an adequate level of service."

On September 23, 1974, Redi-Flo filed a motion for reconsideration in which it challenged the Board's order as unsupported by evidence in the record. Among its grounds for reconsideration was the allegation that the Homoil Company had been permitted to adopt a fuel adjustment clause as part of its permanent tariff.

After a formal conference with rate counsel, the Board granted the motion for reconsideration and scheduled a public hearing for December 13, 1974 to supplement the record on the financial circumstances of the utility following its first order. At this second hearing, the company submitted new data showing continued losses under the increased tariff. Its operating income statement for the six month period between June 1 and November 20, 1974 revealed a net loss of $68,852. In large part this loss had resulted from the absence of any interim relief during the summer months, when Redi-Flo was purchasing fuel oil at a price above which it could resell to consumers.[7] The company also argued that it was unable to cover its operating expenses under the new tariff because of increasing wholesale costs. Once again it emphasized its critical financial condition, and the risk of losing Amerada Hess as a source of supply because of its inability to make current payments for fuel oil purchases.[8]

---

[7]The utility paid between $.038 and $.065 per gallon of fuel oil above its maximum retail price of $.239 per gallon until October 1, 1974 — the effective date of the tariff approved in the Board's first Order.

[8]As of the date of the hearing, Redi-Flo's total unpaid bills from Amerada Hess for fuel oil supplies and billing services amounted to $253,647.17. In addition, the utility had noncurrent loans totalling $584,556 which were payable to Amerada Hess out of any positive cash flow.

Rate counsel cross-examined Redi-Flo's witnesses closely on certain operating expenses which had proven to be lower in the previous six-month period than the company had projected in the *pro forma* statement submitted at the first hearing. In addition, a resident of Holiday City reported the results of his own survey of local oil prices which revealed an average charge slightly lower than Redi-Flo's. However, rate counsel and the consumer witnesses again agreed that Redi-Flo needed rate relief.

In response to the presentation at this hearing, the Board issued on February 27, 1975 an "Order on Rehearing and Reconsideration" which granted Redi-Flo's request for a higher maximum charge based on a larger spread between wholesale and retail prices. As in the earlier order, however, the Board made no findings of fact concerning the utility's projections of losses under the amended tariff.[9] It did abandon its previous approach of linking Redi-Flo's charges to those of Homoil with the recognition that it was "a utility whose operations are unique, inasmuch as they could be subject to competition from non-regulated companies . . . ." The Board also appeared to adopt Redi-Flo's rationale that market constraints could serve as a substitute for its own regulation, especially because a fair return on the company's investment would warrant a charge above market price; and it added that "to limit the price charged by [Redi-Flo] to its customers could result in a continuing loss of revenue and the possible diminution of service to existing customers." Nonetheless, the Board was unwilling to approve a fuel adjustment clause, finding insufficient evidence to

---

[9]In reviewing the company's presentation of evidence, the Board referred to the *pro forma* statement's projected loss of $8,060 under the increased rates, but then noted that rate counsel's cross-examination raised some question as to the reasonableness of several expense items, including travel expenses, telephone and repairs. It drew no conclusion as to whether these questionable items would reduce the utility's actual loss and provide an operating profit.

justify its implementation. It set a maximum charge as before, and required Redi-Flo to reduce its prices whenever the average price of other distributors went down.

Following this determination, Redi-Flo requested a conference with rate counsel and the Board's staff to discuss the proper design of its tariff. At this meeting the company questioned the Board's rationale for allowing a higher spread between wholesale costs and retail prices without providing for some mechanism to maintain that spread if wholesale costs rose again. It noted that the Board's February order required a decrease in charges if the average price of other distributors dropped and argued that similar flexibility should be allowed for upside price movements. The Board agreed that the order was unsatisfactory and instructed Redi-Flo to make a formal request for a clarification under *N. J. S. A.* 48:2–40. In a letter dated March 25, 1975, Redi-Flo submitted its proposal for a fuel adjustment clause for a third time. Rate counsel lodged a formal objection to the adoption of this provision,[10] and the Board approved the request on July 10, 1975. This final order signified the Board's agreement that "it would be eminently unfair to provide an adjustment which would only operate when there are reductions in the cost of fuel oil over some previously established base cost." Therefore, it found that Redi-Flo had proved the necessity for the fuel adjustment clause and authorized the filing of an amended tariff incorporating this provision. Its Order of Clarification specified that the company would be required to comply with the reporting requirements of *N. J. A. C.* 14:11–1.13, the Board regulation which governs adjustments in rates based on changes in the costs of raw materials such

[10]Rate counsel submitted a letter indicating that he was personally disposed to recommend approval of the fuel adjustment clause but that he had received several complaints from individual Holiday City residents. His letter stated that he felt obliged to register his objection on the basis of these complaints because Redi-Flo's service area encompassed so few customers.

as fuel, coal or gas. In addition, it directed Redi-Flo to submit an affidavit of proof of the increase from its supplier and the effect of the increase on revenues before implementing any adjustment pursuant to the clause.

On August 8, 1975, Redi-Flo submitted its amended tariff to the Board for approval. The following day the Public Advocate, assuming the role of rate counsel for the first time,[11] filed an appeal from that portion of the Board's July 10 order which authorized the adoption of a fuel adjustment clause. The Board approved Redi-Flo's amended tariff on October 9, 1975.

## II

A fundamental issue not addressed by the parties is whether or not the Board made the requisite findings of fact to support its determination of Redi-Flo's rates and approval of its fuel adjustment clause. As mentioned above, Redi-Flo initiated this proceeding under *N. J. S. A.* 48:2–21.2(a). This provision describes one of the "three exceptional and extraordinary situations" in which the Board need not determine a rate base in order to assess the justness or reasonableness of an existing or proposed rate. *In re Intrastate Industrial Sand Rates,* 66 *N. J.* 12, 18 (1974). Thus, unlike the conventional rate hearing which entails a complex and lengthy task of proof in an adversary setting, *see, e. g., State v. N. J. Bell Tel. Co.,* 30 *N. J.* 16 (1959); *N. J. Bell Tel. Co. v. Bd. Pub. Utility Comm'rs.,* 12 *N. J.* 568 (1953); *Central R. Co. of N. J. v. Dept. of Public Utilities,* 7 *N. J.* 247 (1951), *N. J. S. A.* 48:2–21.2(a) permits a more abbreviated proceeding in which the Board need find only (1) that the utility sustained a net loss in operating income over the preceding 12 months and (2) that the proposed rates will not yield a net operating profit over the succeeding 12 months. Once this initial test is met, the Board has wide discretion

---

[11]*See ante* at 27 note 5.

in the selection of any particular formula for the purpose of making an ultimate conclusion as to the reasonableness or justness of the utility's rates. *Cf. State v. N. J. Bell Tel. Co., supra,* 30 *N. J.* at 29; *Public Service Coordinated Transport v. State,* 5 *N. J.* 196, 217 (1950); *Atlantic City Sewerage Co. v. Bd. Pub. Utility Comm'rs.,* 128 *N. J. L.* 359, 366 (Sup. Ct. 1942). The only express statutory command is the requirement that the Board make findings of fact on the basis of which it has prescribed the rates or charges.

From our careful examination of the testimony and exhibits presented by Redi-Flo at the two public hearings, we have little doubt that the record contained substantial credible evidence to support a finding that the company incurred substantial losses during the 12-month period preceding Redi-Flo's filing of a petition for rate relief. Neither rate counsel nor the company's customers questioned the financial statements showing Redi-Flo's past losses, and we have no reason to think that the Board took a different view. But nowhere in any of its three orders did the Board ever make any such finding of fact in express terms. Nor did it ever make mention of the second requirement of *N. J. S. A.* 48:2–21.2(a) — that the proposed increase in rates do not result in a net operating profit over the next 12 months.

Although it has been a consistent practice of the courts to require specific findings of fact by the Board and not to supply such findings by implication, *State v. N. J. Bell Tel. Co., supra,* 30 *N. J.* at 33–34; *Central R.R. v. Department of Public Utilities, supra,* 7 *N. J.* at 261, we would be hesitant to remand this case to the Board solely for this reason if we were firmly convinced that the statutory criteria had actually been applied. A reading of the Board's orders, however, leads us to conclude otherwise. The first order, issued on September 12, 1974, made no reference whatsoever to the two-part test set forth in *N. J. S. A.* 48:2–21.2(a) or to Redi-Flo's financial data purporting to satisfy those tests. The Board did comment on the company's failure to establish a rate base, but

it concluded that an alternative approach was warranted because Redi-Flo's accountant had stated that the conventional method of setting a fair return would have resulted in a higher rate than the one Redi-Flo sought. *See ante* at 28. The inescapable inference is that the Board neglected to pursue the normal procedures solely on the strength of the company's undocumented representation. Yet, such an action seems virtually inconceivable in light of the consistent line of authority requiring close scrutiny of a utility's books and records. *See, e. g., In re Intrastate Industrial Sand Rates, supra,* 66 *N. J.* at 22; *N. J. Bell Tel. Co. v. Bd. of Pub. Utility Comm'rs, supra,* 12 *N. J.* at 586–87; *Central R. Co. v. Bd. of Public Utility Comm'rs,* 10 *N. J.* 255, 266 (1952); *Public Service Coordinated Transport v. State, supra,* 5 *N. J.* at 218–19. Despite the fact that rate counsel did not directly challenge the company's projections of continued losses, it was incumbent upon the Board to apply the criteria of *N. J. S. A.* 48:2–21.2(a) and make findings pursuant thereto. The hearing focused to a great extent on the propriety of using local competitive prices as opposed to the prices of Homoil Company. Nevertheless, the Board expressly observed that Redi-Flo's level of operating expenses had not been proven to be reasonable. This failure of proof makes questionable the utility's projection of a $10,700 net operating loss.

Although the February 27, 1975 Order on Reconsideration did refer to a projected loss of $8,060 under Redi-Flo's new proposed rates, once again the Board questioned the reasonableness of some estimated expense items which had been challenged by rate counsel on cross-examination.[12] The final

---

[12]The Board specifically mentioned expenses for travel, repairs and telephone service as questionable items. Redi-Flo estimated $3,600 for travel, $4,300 for repairs and $2,500 for telephone bills when it drew up its first pro forma statement in May of 1974. Its subsequent statement for the June 1, 1974 to November 30, 1974 period showed actual expenditures of $994, $921 and $706, respec-

Order of Clarification dated July 10, 1975 did not refer to the effect of the fuel adjustment clause on net profits.

Hence, our holding herein is expressly based upon the absence of findings of fact needed to support the exercise of the Board's statutory authority to approve an increase in rates, which encompassed the fuel adjustment clause challenged by the Public Advocate. On remand, the Board should either make such findings and determinations under *N. J. S. A.* 48:2–21(a) as seem warranted from the evidence contained in the record or determine and fix such rates as are needed for a fair return based on the company's rate base, income and operating expenses.

### III

■ While our holding renders Redi-Flo's fuel adjustment clause invalid for the time being, it does not resolve the more important question of whether the Board has the authority to re-adopt such a clause on remand. In the interests of bringing this litigation to a close, we address the contentions of the Public Advocate insofar as they bear on Redi-Flo's tariff provision.

---

tively, amounting to roughly $5,200 over a full year. The Board failed to say whether, and to what extent, any of these estimates was unreasonably high. Thus, it is impossible to determine their impact on the company's net operating loss (estimated at $8,060) for that period. Theoretically, if the entire sum of $10,400 were disallowed, the operating statement would show a net profit.

To be sure, the Board did recognize Redi-Flo's inability to pay Amerada Hess the amounts owed for fuel oil purchases under the schedule of rates approved in the first Board Order. It also stated that there was no reasonable expectation that the company would be able to reduce its total indebtedness of more than $800,000 to Amerada Hess under the increased rates sought at the rehearing. But the record contains no indication that Redi-Flo's annual interest charges to Amerada Hess fall within the statutory term "operating expenses." On the contrary, it seems that a distinction was drawn between the company's net profit or loss in operating expenses and net income or loss for the entire operation.

As we construe the Public Advocate's position, it consists of two separate arguments. The first is predicated on the asserted lack of statutory authority to increase rates by any other means than through a conventional rate proceeding in which the utility establishes facts from which the Board can find that the rates are "just and reasonable." The lone exception to this rule, in his view, is a "negotiated" rate increase under *N. J. S. A.* 48:2–21.1 which is subsequently reviewed in a conventional hearing, as was permitted in *In re Board's Investigation of Tele. Cos.,* 66 *N. J.* 476 (1975). The second relates to the adequacy of the Board's review mechanisms to ensure that a utility's rates continue to be "just and reasonable" after the automatic increases and that the claimed increases in fuel costs were validly incurred. The Public Advocate argues that the Board's existing requirements under *N. J. A. C.* 14.11–1.13 should be replaced by periodic "mini hearings" to prevent any unwarranted rate increases. Essentially, he alleges that the Board is abusing its discretion by failing to monitor the fuel adjustment clauses in an effective manner.

As to the first argument, we agree with the initial premise that an increased charge to consumers resulting from the operation of a fuel adjustment clause falls within the statutory definition of an "increase, change or alteration" in "any existing individual rates, joint rates, tolls, charges or schedules thereof." *N. J. S. A.* 48:2–21(d). Furthermore, there is no doubt that the Board has the *power* to suspend any proposed increase and conduct public hearings for the purpose of establishing whether an increase is "just and reasonable." *See N. J. Bell Tel. Co. v. Bd. Pub. Utility Comm'rs, supra,* 12 *N. J.* at 581. The question is when, and whether, it *must* submit a public utility's request for increased rates and charges to a full-scale evidentiary proceeding involving a rate base determination pursuant to *N. J. S. A.* 48:2–21 rather than to the more abbreviated proceeding permitted by *N. J. S. A.* 48:2–21.2.

We begin by noting that *N. J. S. A.* 48:2–21 does not *require* the Board to hold rate hearings and make findings when a utility files a tariff of rates and charges. *N. J. S. A.* 48:2–21(a) states only that the Board "may" require all public utilities to file with it complete schedules of "every classification employed and of every individual or joint rate, toll, fare or charge made, charged or exacted by it for any product supplied or service rendered within this State." *N. J. S. A.* 48:2–21(b) similarly provides that the Board "*may* after hearing, upon notice, by order in writing . . . fix just and reasonable individual rates . . ." whenever it determines that existing rates are unjust, unreasonable, insufficient or unjustly discriminatory or preferential. And *N. J. S. A.* 48:2–21(d) states that the Board "*shall have power*" to suspend a utility's tariff proposing increased rates and to issue a written order determining whether they are "just and reasonable" after a hearing upon notice.

These statutes indicate that the Legislature gave the Board *discretionary* power to require rate filings and to hold hearings thereon, and the Board's regulations reflect this grant of discretion. *See, e. g., N. J. A. C.* 14:1–16.1(c) (providing for notice of a hearing "if any" on proposed rate increases). The record in this case shows that the Board did not require Redi-Flo to establish its rate increases by way of a rate proceeding until 1974. Prior to that time the utility filed a tariff based on its contracts with its customers, which set a maximum price per gallon of fuel oil and provided for fluctuating charges not exceeding the average retail price of major oil distributors. See *ante* at 26.

This basic grant of power, however, does not give the agency untrammeled discretion to ignore unjustified or improper rate increases. *N. J. S. A.* 48:2–13 charges the Board with the task of overseeing the operations of all public utilities in accordance with the purposes of the Public Utilities Act, and foremost among these responsibilities is its duty to ensure that rates are not excessive. *N. J. S. A.* 48:2–21(b)(1) authorizes the agency to commence rate pro-

ceedings at any time on its own initiative or in response to a written complaint, and *N. J. S. A.* 48:2–21(d) contains a similar provision as to proposed rate increases.

We understand the Board's position to be that no rate proceedings are required so long as the proposed increases in charges to customers do not affect the public utility's rate of return. We are not persuaded by this argument. Theoretically, a fuel adjustment clause has no impact on a utility's rate of return as long as the relationship among the various elements which were considered in determining the fair return remains unchanged. The automatic "pass-through" provisions simply effect an increase or decrease in revenues to compensate for higher or lower costs, thus theoretically maintaining the same rate of return. *See, e. g., City of Los Angeles v. Public Utilities Comm'n,* 15 Cal. 3d 680, 125 *Cal. Rptr.* 779, 542 *P.* 2d 1371, 1382 (1975); *Consumers Organization for Fair Energy Equality, Inc. v. Department of Public Utilities,* 335 *N. E.* 2d 341, 344–45 (Mass. Sup. Jud. Ct. 1975); *City of San Antonio v. San Antonio Ind. Sch. Dist.,* 535 *S. W.* 2d 671, 673 (Tex. Civ. App. 1976); *State ex rel. Utilities Comm'n v. Edmisten,* 26 *N. C. App.* 662, 217 *S. E.* 201, 205–06 (1975). The rationale for this position is outlined in the leading case of *City of Norfolk v. Virginia Elec. & Power Co.,* 197 *Va.* 505, 90 *S. E.* 2d 140 (1955), where the court likened an automatic pass-through clause to a mathematical formula which was an integral part of the utility's rates:

> The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates. Hence, the resulting rates under the escalator clause are as firmly fixed as if they were stated in terms of money.
>
> [90 *S. E.* 2d at 148.]

We cannot adopt this position because of its fundamental inconsistency with *N. J. S. A.* 48:2–21(d), which defines

a rate increase from the standpoint of the consumer. Since a fuel adjustment clause would cause an increase in the consumer's out-of-pocket expenditure for fuel, it plainly falls within the statutory definition of a rate increase. Accordingly, we hold that a fuel adjustment clause can be implemented only after a rate proceeding in accordance with *N. J. S. A.* 48:2–21 or 48:2–21.2.[13]

The legality of the fuel adjustment clause as a permanent component of a utility's tariff arose as an issue for the first time in this case when the Public Advocate appealed the Board's July 10 order. Consequently, the Board never discussed many of the questions concerning its economic merits, statutory basis or potential for abuse which have engaged the parties before us.[14] Nor does the Board appear to have given a comprehensive treatment of these issues in other decisions approving similar adjustment clauses. *See, e. g., N. J. Natural Gas Co.,* 6 *PUR* 3d 249 (N. J. Bd. of Pub. Util. Comm'rs 1954); *Re Elizabethtown Consolidated Gas Co.,* 96 *PUR* (*NS*) 487 (N. J. Bd. of Pub. Util. Comm'rs 1954); *Re South Jersey Gas Co.,* 96 *PUR* (*NS*) 71 (*N. J.* Bd. of Pub. Util. Comm'rs 1952); *Re Jersey Central Power & Light Co.,* 66 *PUR* (*NS*) 129 (N. J. Bd. of Pub. Util. Comm'rs 1946). This is somewhat surprising since it has approved such clauses since 1917, *see Atlantic Cty. Elec.*

---

[13]The Board, of course, retains its ability to authorize the implementation of a fuel adjustment clause as an interim relief measure in the context of a pending rate proceeding pursuant to *N. J. S. A.* 48:2–21.1.

[14]*See* Trigg, Escalation Clauses in Public Utility Rate Schedules, 106 *U. Pa. L. Rev.* 964 (1958). For more recent notes on the subject, *see* Schiffel, "Electric Utility Regulation: An Overview of Fuel Adjustment Clauses," *Pub. Util. Fort. Rev.* 23 (June 1975); *Fowler,* 6 *St. Mary's L. J.* 567 (1974); Note, 47 *Miss. L. J.* 302 (1976). Fuel adjustment clauses were also examined by Congress in 1974–75. Report by the Subcomm. on Oversight & Investigations of the Comm. on Interstate & Foreign Commerce, "Electric Utility Automatic Fuel Adjustment Clauses," 94th Cong., 1st Sess. (1975).

*Co.,* 1918 *B PUR* 589, 592 (N. J. Bd. of Pub. Util. Comm'rs 1917) ; Brown, *Public Utility Law in New Jersey,* 525–26 (1925). We are told that they are currently a standard feature of the tariffs of many other utilities in New Jersey, including that of the Homoil Co. Nonetheless, the lack of any authoritative statement by the Board lessens the degree of deference to be paid to long-standing interpretations of statutes by the administrative agency charged with implementing its legislative mandate. *Service Armament Co. v. Hyland,* 70 *N. J.* 550, 561–63 (1976) ; *Mayflower Securities v. Bureau of Securities,* 64 *N. J.* 85, 93 (1973).

Despite the silence of the Board on this subject, we think that the evidence in the record would support the adoption of a fuel adjustment clause applicable to Redi-Flo. Unlike electric utilities, which transform fuel oil into another form of energy, Redi-Flo merely resells fuel oil to customers, deriving its gross profits from the spread between the wholesale cost and retail price of fuel oil. Its margin is fixed by Board order at a specified amount per gallon ($.0863) so that its only means of increasing revenues lies in widening its service area to include more customers. With its current losses of customers and the absence of plans for expansion of Holiday City, however, this option appears to be foreclosed. Thus, as inflation causes its expenses to increase, the company will actually sustain greater losses unless it improves its operations. We see no likelihood that the fuel adjustment clause, if applied properly, can, in and of itself, affect Redi-Flo's present rate of return, although it nevertheless would be covered by the statutory definition of rate increase (see discussion ante at 39–41).

Redi-Flo's fuel adjustment clause thus bears little resemblance to the Comprehensive Adjustment Clause which was considered in *In re Board's Investigation of Tele. Cos.,* 66 *N. J.* 476 (1975), although both were designed as de-

vices for stabilizing the utility's rate of return. *Id.* at 482.[15] In contrast to the monopolistic position of the New Jersey Bell Telephone Company, Redi-Flo is subject to competition from rival suppliers of fuel and other forms of heating, a fact demonstrated by its loss of customers. Its retail prices are unavoidably related to the average prices of these local competitors, thus ensuring its consumers that they will not pay more than the market price of fuel oil. Moreover, Redi-Flo's income, expense items and rate base can be readily verified by the Board's staff through relatively simple procedures. Under these circumstances, we see little practical benefit in treating this clause as a form of interim relief which must be validated in the context of a final rate determination. *Cf. In re Board's Investigation of Tele. Cos., supra,* 66 *N. J.* at 495.

However, even if we assume that the Board has not exceeded its delegated powers by allowing Redi-Flo to pass on higher fuel costs as a means of maintaining its "spread," we cannot be satisfied that such a clause is "just and reasonable" if it operates free from Board supervision. *Cf. City of Evansville v. Southern Ind. Gas & Elec. Co.,* 339 *N. E.* 2d 562, 594–95 (Ind. Ct. App. 1976); *L. S. Ayres & Co. v. Indianapolis Power & Light Co.,* 351 *N. E.* 2d 814, 838–39 (Ind. Ct. App. 1976). The current procedures call for filings seven days before any adjustment is to be effective, with supporting data and affidavits, *N. J. A. C.* 14:11–

---

[15]The Comprehensive Adjustment Clause allowed four categories of expenses to be passed on to customers in varying portions: (1) salaries and wages, including fringe benefits; (2) depreciation expense; (3) other expenses (a catch all provision); and (4) taxes. 66 *N. J.* at 482–83. Although the Board likened this device to fuel adjustment and purchase gas adjustment clauses, 66 *N. J.* at 486 and n. 11, it was acknowledged to be experimental in nature. *Id.* at 485, n. 9. The Board subsequently suspended the use of this clause in favor of granting rate relief by a fixed dollar amount. See Note, 29 *Rutgers L. Rev.* 755, 768 and n. 106 (1976); Note, 6 *Seton Hall L. Rev.* 551 (1975).

1.13(a), but they make no formal provision for notice to either the Public Advocate or the consumers. Nor does there appear to be any systematic review of such increases over a period of time, aside from the monitoring by the Bureau of Audit. On this record we cannot say that the absence of such procedures constitutes an abdication of the Board's supervisory role in all instances, or that the institution of "mini hearings" for all such increases is necessarily appropriate. *See* Pollock, "The Cure for Regulatory Lag: Efficient Case Load Management," *Pub. Util. Fort. Rev.* 27 (July 1976).

Furthermore, in this case there are other troublesome issues which could well be examined in the context of a limited hearing on remand. The first is Redi-Flo's relationship with its supplier, Amerada Hess. The Board's initial order on September 12, 1974 suggested that Redi-Flo should have been able to purchase fuel oil below market price because of its interlocking ownership with Amerada Hess. In its subsequent order on February 27, 1975, the Board made a turnaround in which it emphasized the danger that Redi-Flo would lose Amerada Hess as a supplier. It apparently ignored the question of whether Redi-Flo was paying a reasonable price for fuel oil, or whether Amerada Hess, an unregulated parent company, was charging Redi-Flo more than its fair cost.[16]

The second issue concerning the implementation of Redi-Flo's fuel adjustment clause is the degree to which its retail prices for fuel oil have reflected the average price of major oil distributors in the area. The Board's final order on July 10, 1975 built in the requirement that the company's monthly charge to customers be limited to the "average prevailing price of fuel oil" calculated on the

---

[16]The parties have not briefed the issue, and we intimate no opinion as to whether it is unreasonable for an unregulated parent company as a regulated parent company to charge an affiliate more than cost.

same basis as an exhibit introduced by Redi-Flo at the December 13, 1974 hearing. This exhibit showed the prices of six dealers as of December 11, 1974. The Board's order neither explains why a single day, rather than a monthly average, is taken as the "prevailing" price nor justifies the reliance on these particular six dealers.[17] Furthermore, it makes no express provision for submission of periodic reports by Redi-Flo demonstrating that the average prevailing price has not dropped below its own charges.

On remand the Board may pursue these matters in conjunction with the establishment of a proper statutory basis for rate setting, or separately under its own investigatory powers. *N. J. S. A.* 48:2-19(a). The order appealed from is hereby vacated and the matter remanded to the Board for further proceedings consistent with this opinion. We do not retain jurisdiction.

*For modification and remandment*—Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—5.

*Opposed*—None.

---

[17] A customer of Redi-Flo took a survey of 11 dealers on December 2, 1974 and calculated a price slightly lower than Redi-Flo's.